873 A.2d 1161

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Jerry Deneise JORDAN.**

**Misc. Docket AG No. 37, Sept. Term, 2003.**

Court of Appeals of Maryland.

May 10, 2005.

584

James B. Botluk, Asst. Bar Counsel (Melvin Hirshman, Bar Counsel for Atty. Grievance Com'n), for petitioner.

Jerry Deneise Jordan, Baltimore, for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, J.

Pursuant to Maryland Rule 16–751 [1] of the Maryland Rules of Professional Conduct (MRPC), the Attorney Grievance Commission (the Commission), acting through Bar Counsel, filed a petition for disciplinary action or remedial action against Jerry Deneise Jordan (respondent). In that petition, it was alleged that respondent violated Maryland Rule 16–812, Maryland Rules of Professional Conduct (MRPC). With respect to the MRPC, the petition alleged that respondent violated Rules 8.4(b) and 8.4(c). [2]

Pursuant to Maryland Rule 16–752(a) [3], we referred the matter to Judge Michael J. Finifter of the Circuit Court for Baltimore County to make findings of fact and conclusions of law in accordance with Maryland Rule 16–757(c) [4]. Following

---

1. Maryland Rule 16–751, as relevant, provides:

 (a) **Commencement of disciplinary or remedial action.**
 (1) Upon approval of the Commission. Upon approval or direction of the Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals.

2. **Rule 8.4. Misconduct.**

 It is professional misconduct for a lawyer to:

 \* \* \* \* \* \*

 (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
 (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

 \* \* \* \* \* \*

3. Rule 16–752(a) provides:

 (a) **Order.** Upon the filing of a Petition for Disciplinary or Remedial Action, the Court of Appeals may enter an order designating a judge of any circuit court to hear the action and the clerk responsible for maintaining the record. The order of designation shall require the judge, after consultation with Bar Counsel and the attorney, to enter a scheduling order defining the extent of discovery and setting dates for the completion of discovery, filing of motions, and hearing.

4. Maryland rule 16–757(c) provides:

 (c) **Findings and conclusions.** The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law. If dictated into the record, the statement shall be promptly transcribed. Unless the time is extended by the Court of

an evidentiary hearing, Judge Finifter found that respondent had violated MRPC Rules 8.4(b) and 8.4(c). Respondent filed exceptions to Judge Finifter's findings.

## I.

The charges in this matter arose out of respondent's alleged willful submission of fraudulent documents to her home-owner's insurance company, St. Paul Traveler's Insurance Company. As a result of respondent's action, the insurance company paid her compensation she was not otherwise entitled to receive. After an evidentiary hearing, Judge Finifter made the following factual findings and conclusions of law:

## "FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came before the court for hearing on September 13, 2004. Petitioner has alleged that the Respondent submitted fraudulent documents to her homeowner's insurance company that resulted in monetary disbursements to Respondent [to which she] was otherwise not entitled, and that Respondent's actions were a violation of the Maryland Rules of Professional Conduct. Upon consideration of the evidence presented, including the exhibits, testimony and stipulations, the court finds as follows:

## "FINDINGS OF FACT

1. Respondent, Jerry D. Jordan, is an attorney licensed to practice law in the State of Maryland.

2. Respondent is the owner of a home that suffered extensive damage resulting from a water leak located at 212 Barron Avenue in Baltimore County, Maryland. Respondent learned of the damage to her home on or about November 15, 2000.

---

Appeals, the written or transcribed statement shall be filed with the clerk responsible for the record no later than 45 days after the conclusion of the hearing. The clerk shall mail a copy of the statement to each party.

3. After discovering the water damage to her home, Respondent contacted her homeowner's insurance company, St. Paul Traveler's Insurance Company ("Traveler's").

4. Traveler's assigned Michael McBain, an inside claims representative, to handle Respondent's claim that resulted out of said water leak.

5. Mr. McBain estimated that it would take approximately two to three months to repair Respondent's home.

6. Mr. McBain explained the terms of the Respondent's policy to the Respondent and the options available to her under the terms of the homeowner's insurance policy. One of the options available to Respondent under the terms of her homeowner's insurance policy was for reimbursement of monies expended for rent while Respondent was not residing at her water-damaged home.

7. The Respondent indicated to Mr. McBain that she had found a place to rent for $2,000.00 per month located at 11 Anchor Way in Berlin, Maryland, during the time that her home was not habitable due to the extensive damage and resulting repairs.

8. In fact, Respondent owned the home located at 11 Anchor Way, Berlin, Md., that she purported to be renting at a cost of $2,000 per month.

9. Respondent never told Mr. McBain that she owned the house for which Traveler's was supplying rent money.

10. On January 6, 2001, Mr. McBain ceased working on Respondent's claim file.

11. On January 17, 2001, Respondent's file was transferred to Linda Quinonez, an employee of Traveler's, because Mr. McBain had left the unit.

12. Upon receiving Respondent's claim file, Ms. Quinonez observed that Mr. McBain agreed to pay Respondent $2,000 per month in rental expenses, but that the file lacked documentation of the actual rental agreement. Instead, the file only contained typed one-line receipts for rent monies received from Jerry Jordan in the amount of $2,000.00 for the months of December and January. See Pet. Ex 3 pp.

54–55. The "receipts" were signed by Janet L. Coyne [Janet L. Coyne, spouse of V.F. Coyne never received any money from Jerry Jordan for rental of any property].

13. Ms. Quinonez was concerned about the lack of information in the claim's file to support Respondent's claim that she was entitled to reimbursement for expending rent money. Ms. Quinonez requested that the Respondent supply additional information in support of the rental agreement so that Traveler's could continue to pay monies out.

14. On February 5, 2001, Respondent sent a letter to Ms. Quinonez stating that she was not "getting repaid for the rent I [Respondent] am paying on my current lodgings." See Pet. Ex 3, p. 27. In fact, Respondent made specific representations to Traveler's that indicated that Respondent was renting a home for $2,000.00 per month, and made numerous requests for reimbursement. See Pet Ex 3, pp. 20–24, 26–28, 29, 34–36, 54, 55, 63 & 89.

15. Respondent provided Ms. Quinonez with a short rental agreement on February 5, 2001 in response to Ms. Quinonez's requests. The Rental Agreement indicated that Mr. Coyne agreed to rent the subject property to Respondent for a period not to exceed 5 months at a rate of $2,000.00 per month. See Pet Ex 3, p. 63

16. Ms. Quinonez made attempts to contact Mr. Coyne, the landlord, to verify the terms of the Rental Agreement. However, Ms. Quinonez was not able to reach Mr. Coyne and instead found that the telephone number she was given was for a pub-restaurant.

17. Ms. Quinonez then contacted an investigator, Gary Dunnigan, to verify ownership of the property that Respondent claimed to be renting, and Respondent's claim file was transferred to Teresa Albertson, the Custodian of Records, in mid-March, 2004.

18. Traveler's received an Affidavit from the Respondent dated February 28, 2001, that indicated that V.F. Coyne owned the property located at 11 Anchor Way Drive, Berlin, Maryland. The Affidavit was notarized by the Respondent,

Jerry D. Jordan. The Affidavit indicated that the Respondent agreed to pay Mr. Coyne $2,000.00 per month and that Mr. Coyne had received $6,600.00 thus far in rental payments. The Affidavit was sent by letter to Traveler's, "Attn: Gary Dunnigan." See Pet Ex 5.

19. Traveler's learned that Respondent owned the property she purported to be renting for $2,000.00 per month, and became concerned that Respondent was not paying rent to Mr. Coyne. Respondent was only entitled to be reimbursed for rent paid under her homeowner's insurance policy if Respondent actually made such rental payments.

20. Due to Traveler's concerns regarding Respondent's requests for reimbursement for rental payments, Traveler's sent Respondent a "general reservation of rights letter" on March 29, 2001. The purpose of that letter was to inform Respondent that Traveler's reserved the right to deny coverage to investigate the veracity of Respondent's claim.

21. Traveler's also wished to conduct an examination under oath of the Respondent regarding Traveler's concerns. Respondent, however, refused to submit to an examination under oath. After Respondent refused to submit to an examination under oath, Traveler's denied Respondent's claim for misrepresentation and for failing to submit to said examination on March 21, 2002. The basis for Traveler's allegations of misrepresentation was that the Respondent sent an Affidavit that stated Mr. Coyne owned and was receiving rent for the "rental property" when in fact Traveler's investigation revealed that Respondent owned the property located at 11 Anchor Way. See Pet Ex 1.

22. Traveler's brought allegations of insurance fraud against Respondent to the Attorney General's Office.

23. The Attorney General's Office assigned David Webb to investigate Traveler's allegations. Specifically, Mr. Webb investigated whether the Respondent had committed fraud by misrepresenting that she was renting a house owned by Mr Coyne.

24. Mr. Webb interviewed Respondent on June 26, 2001, and Respondent gave her consent to be interviewed with full knowledge that anything she stated would be presented to a grand jury and that Mr. Webb had no police powers.

25. At the interview with Mr. Webb, Respondent admitted that the documents that she submitted to Traveler's "... were not the truth ..." and that "she [Respondent] would probably lose her license as a lawyer."

26. In Respondent's case in chief, Respondent testified on cross-examination that she owned the "rental property" located at 11 Anchor Way, that she never paid any rent to Mr. Coyne, and that she never had a real rental agreement with Mr. Coyne.

27. The court finds the admissions of the Respondent at the interview and her decision to testify in court to be knowing, voluntary and intelligent.

28. Respondent, in her case in chief and through cross-examination of Petitioner's witnesses made several arguments in her defense and the following assertions.

a. Respondent argues that Mr. McBain knew that she was in fact the owner of the "rental property."

b. Respondent argues that she and Mr. McBain worked out a deal whereby the rent money that Respondent would receive was really in lieu of other types of expenses such as travel and telephone costs. In addition, Respondent alleges that Mr. McBain and Traveler's "left a trap" for her to fall into so that Traveler's wouldn't have to pay the claim.

c. Respondent also argues that her state of mind and physical condition were both fragile when she realized the extent of damage caused to her home by the water leak. Respondent argues that she was on various medications and had many concerns regarding her family and plans for the holidays when she was forced to find a place to live after the damage to her home, and that all of these circumstances made her particularly vulnerable.

d. Finally, Respondent's Mother, Ruth Mitchell, testified that she [Ruth Mitchell] notarized the Affidavit in support

of a rental agreement with Mr. Coyne, and that Ms. Mitchell mailed the Affidavit back to Traveler's.

29. Having considered all of the Respondent's arguments, evidence and testimony in support of her position, the court does not find Respondent's position to be credible.

30. The court does not find that there was ever any agreement between Mr. McBain, Traveler's or Respondent that entailed reimbursement for a "rental agreement" in lieu of providing receipts of actual expenses incurred. Furthermore, the court does not find Ms. Mitchell's testimony to be credible in this case. Ms. Mitchell did not know to whom she sent the Affidavit of the rental agreement, nor did she understand why she was sending the Affidavit, nor the contents contained in the Affidavit. Finally, the court finds that Respondent understood the consequences of her actions when she submitted false documents to Traveler's for reimbursement for expenses that she was not entitled to receive. Respondent's capacity to control her conduct with respect to making false representations in this case was not inhibited by the medications that she was receiving nor the pressures that she experienced as a result of the circumstances in which she was placed by the water damage to her home.

After reviewing the applicable law and the parties' arguments, the hearing court made Conclusions of Law as follows:

## "CONCLUSIONS OF LAW

Based upon the findings of fact set forth above, this court concludes that Respondent violated Rule 8.4(b) (committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects) and Rule 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation) of the Maryland Rules of Professional Conduct. Respondent committed these violations by submitting fraudulent documents to her homeowner's insurance company that asserted that she was

renting a home owned by Mr. Coyne at a cost of $2,000.00 per month when no such rent was paid and Respondent owned that residence."

## II.

### Exceptions

Bar Counsel filed no exceptions to the hearing judge's findings of fact and conclusions of law. Respondent filed exceptions contending that the hearing judge did not take her medical condition seriously (she was on medication for stress and anxiety), that "nothing in this case involved a client or the practice of law," and that the hearing judge assigned this matter was biased. Respondent also asserts that because she has not been prosecuted for a crime, her dishonest act has not been proven.

At a hearing of a disciplinary or remedial action, the Attorney Grievance Commission must prove by clear and convincing evidence the charges in their petition. Md. Rule 16–757(b). Respondent has the burden of proving any affirmative defenses and extenuating or mitigating circumstances by a preponderance of the evidence.

We have said that,

this Court exercises original jurisdiction over attorney discipline proceedings. We conduct an independent review of the record, accepting the hearing judge's findings of fact unless clearly erroneous. We will not disturb the factual findings of the hearing judge if they are based on clear and convincing evidence. Our review of the hearing judge's conclusions of law is *de novo.*

*Attorney Griev. Comm'n v. Gore,* 380 Md. 455, 468, 845 A.2d 1204, 1211 (2004) (quoting *Attorney Griev. Comm'n v. Davis,* 375 Md. 131, 157–58, 825 A.2d 430, 445–46 (2003) (citations omitted)).

When either petitioner or respondent files exceptions, the Court of Appeals shall determine whether the findings of fact have been proven by the requisite standard of proof

set out in Rule 16–737(b). The Court may confine its review to the findings of fact challenged by the exceptions. The Court shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses.

Md. Rule 16–759(b)(2)(B). In this instance we cannot say that the hearing judge's findings of fact were clearly erroneous. There was considerable evidence, to a clear and convincing standard, that Ms. Jordan intentionally submitted false documents to her insurance company for the purpose of obtaining monetary benefits to which she was not entitled. Eventually, Ms. Jordan admitted that she was not entitled to any reimbursement for rental payments because Mr. Coyne was not her landlord. We agree with Judge Finifter that Ms. Jordan violated MRPC Rules 8.4(b) and 8.4(c). Consequently, Ms. Jordan's factual exceptions are overruled.

### Sanction

■ Next we will discuss the appropriate sanction to impose because of Ms. Jordan's misconduct. We have said time and time again that our goal in matters of attorney discipline is to protect the public and the public's confidence in the legal profession rather than to punish the attorney. *See Attorney Griev. Comm'n. v. Vanderlinde,* 364 Md. 376, 388, 773 A.2d 463, 470 (2001).

In *Attorney Griev. Comm'n v. Post* we noted that, "[d]etermining the appropriate sanction requires the Court to consider the facts and circumstances of each particular case, including consideration of any mitigating factors." *Attorney Griev. Comm'n v. Post,* 379 Md. 60, 71, 839 A.2d 718, 724 (2003). We said in *Post* "the nature and gravity of the violations and the intent with which they were committed" are relevant considerations. *Id.* quoting *Attorney Griev. Comm'n of Maryland v. Awuah,* 346 Md. 420, 435, 697 A.2d 446, 454 (1997).

■ When an attorney is able to prove compelling extenuating circumstances, we will take that into consideration when deciding the appropriate sanction. *Attorney Griev. Comm'n v. Christopher,* 383 Md. 624, 648, 861 A.2d 692, 706. We have held that:

[W]e will not accept, as "compelling extenuating circumstances," anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the "root cause" of the misconduct *and* that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the MRPC.

*Attorney Griev. Comm'n v. Vanderlinde*, 364 Md. at 413–14, 773 A.2d at 485 (emphasis in original).

In *Christopher*, there was testimony from two doctors regarding Christopher's depression and alcoholism which had existed over a long period of time. Testimony from one doctor indicated that Christopher's "mental conditions were the root cause of his misconduct." This testimony was not challenged by Bar Counsel and the hearing judge, therefore, found it credible. *Christopher*, 383 Md. 624, 646, 861 A.2d 692, 705. In *Christopher* there was also testimony from the same doctor that "Mr. Christopher was unable to control his conduct." *Christopher*, 383 Md. 624, 648, 861 A.2d 692, 706. For these reasons, we concluded that the appropriate sanction for Mr. Christopher was an indefinite suspension with the right to apply for reinstatement. In *Christopher* facts supported the conclusion that Christopher's mental and physical condition was the root cause of his misconduct, i.e., his filing false reports with the Register of Wills. *Id.*

By contrast, in *Vanderlinde*, Vanderlinde's act of misappropriating money from her employer for her own use resulted in her disbarment. There was conflicting medical testimony in *Vanderlinde*. The hearing judge credited the Commission's testimony in that regard, finding no extenuating circumstances. *Vanderlinde*, 364 Md. at 387, 773 A.2d at 469 n. 6. We agree. Further, the Court found it of no consequence that Vanderlinde's dishonesty took place while working outside the profession of law for a community association. *Vanderlinde*, 364 Md. at 381, 413–14, 773 A.2d at 486.

Judge Cathell, writing for the Court, stated in *Vanderlinde* that,

in cases of intentional dishonesty, misappropriation cases, fraud, stealing serious criminal conduct and the like, we will not accept, as "compelling extenuating circumstances," anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the "root cause" of the misconduct and that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the MRPC. Only if the circumstances are that compelling, will we even consider imposing less than the most severe sanction of disbarment in cases of stealing, dishonesty, fraudulent conduct, the intentional misappropriation of funds or other serious criminal conduct, whether occurring in the practice of law or otherwise.

*Vanderlinde,* 364 Md. at 413–14, 773 A.2d at 485.

In the present case, respondent neither presented sufficient evidence of such extenuating circumstances, nor did she present any supporting testimony from medical professionals. Ms. Jordan testified that in June of 2001 she was "still under doctor's (sic) care and [on] extensive medication for stress and injuries." The only evidence respondent submitted to corroborate this statement was a computer printout from CVS pharmacy # 4371 in Ocean City, Maryland. The printout is for the period from February 10, 2001, to June 27, 2001, and shows one prescription for Wellbutrin [5] on February 10; two for Alprazolam [6] on February 23 and June 27; one for Acetaminophen with Codeine [7] on March 16; one for Vicoprofen [8]

---

**5.** Trade name for a preparation of bupropion hydrochloride. Antidepressant used for treating major depression and smoking cessation. AHFS DRUG INFORMATION, 2278–89, American Society of Health System Pharmacists, (2005), § 28:16.04.92.

**6.** Trade name for a preparation of benzodiazepine used in the treatment of anxiety disorders and depression. AHFS DRUG INFORMATION, 2404, American Society of Health System Pharmacists, (2005), § 28:24.08.

**7.** Used in the treatment of moderately severe to severe pain and fever. AHFS DRUG INFORMATION, 2096–2104, American Society of Health System Pharmacists, (2005), § 28:08.92.

**8.** A form of hydrocodone used for relief of moderate to moderately severe pain. AHFS DRUG INFORMATION, 2053–55, American Soci-

on March 16; two for Erythromycin [9] on March 15 and March 19; two for Oxycodone [10] on April 20 and May 26; five for Hydrocodone [11] on April 26, May 4, May 17, May 21, and June 6; three for Flonase [12] on February 9, March 26, and May 5; one for Zoloft [13] on May 14; and one for Celexa [14] on June 27.

■ Aside from the prescription record, respondent provided receipts for two visits to the Atlantic General Hospital emergency room in Berlin, Maryland, on February 22, 2001, and April 18–19, 2001; office visits to Peninsula Orthopaedic Assoc., PA, in Salisbury on April 2 and May 23, 2001; and one office visit to Peninsula Cardiology Associates, PA, on April 12, 2001. None of the treating physicians testified in support of respondent's claim of extenuating circumstances. Further, respondent's medical "condition" and treatment occurred sub-

---

ety of Health System Pharmacists, (2005), § 28:08.08.

9. Trade name for macrolide antibiotic. AHFS DRUG INFORMATION, 224–26, American Society of Health System Pharmacists, (2005), § 8:12.12.04.

10. Trade name for a synthetic phenanthrene-derivative opiate agonist used for moderate to moderately severe pain. AHFS DRUG INFORMATION, 2070–72, American Society of Health System Pharmacists, (2005), § 28:08.08.

11. Used for relief of moderate to moderately severe pain. AHFS DRUG INFORMATION, 2053–55, American Society of Health System Pharmacists, (2005), § 28:08.08.

12. Trade name for fluticasone propionate. Nasal spray used for treatment of seasonal or perennial allergies. AHFS DRUG INFORMATION, 2686–90, American Society of Health System Pharmacists, (2005), § 56:08.08.

13. Trade name for sertraline hydrochloride used for treatment of major depression, panic disorder, posttraumatic stress disorder, among others. AHFS DRUG INFORMATION, 2232–46, American Society of Health System Pharmacists, (2005), § 28:16.04.20.

14. Trade name for citalopram hydrobromide used the treatment of major depression, obsessive compulsive disorder, panic, alcohol dependency, among others. AHFS DRUG INFORMATION, 2181–94, American Society of Health System Pharmacists, (2005), § 28:16.04.20.

sequent to her fraudulent behavior. On this record, it is just as possible that respondent's medical "condition" resulted from the stress of her dishonesty than her dishonesty being a consequence of her medical "condition." We concluded in *Maryland St. Bar Ass'n v. Callanan*, 271 Md. 554, 557, 318 A.2d 809, 810 (1974) that when a medical condition "developed or occurred subsequent to . . . criminal activity," it may not be credible to mitigate the crime. *See also Bar Ass'n of Baltimore City v. Siegel*, 275 Md. 521, 340 A.2d 710 (1975). Therefore, we concur with the hearing court that respondent's claim that the stress in her life and the medications prescribed, standing alone on this record, are not sufficient to constitute extenuating circumstances.

■ Respondent's second claim is that she believes the trial judge was biased. Respondent suggests that the hearing judge permitted petitioner to admit into evidence documents which were "in contravention to the Rules of Evidence, the law and Respondent's constitutional rights." Further, respondent states that the hearing judge did not permit her to cross-examine one of petitioner's witnesses and that "[t]he court bent over backwards to accommodate the Petitioner." In *Attorney Griev. Comm'n v. Shaw*, Chief Judge Bell, writing for the Court, said that, "there is a strong presumption in Maryland, and elsewhere, that judges are impartial participants in the legal process, whose duty to preside when qualified is as strong as their duty to refrain from presiding when not qualified." *Atty. Grievance v. Shaw*, 363 Md. 1, 10, 766 A.2d 1028, 1033 (2001) (quoting *Jefferson–El v. State*, 330 Md. 99, 107, 622 A.2d 737, 741 (1993)). Respondent has failed to point to any specific evidence to support her general allegations or rebut that presumption.

■ Contending that the subject actions were not committed in conjunction with her practice of law, respondent argues that she should not be subject to a sanction as severe as disbarment. Ms. Vanderlinde made the same argument and we said, "only if the circumstances are . . . compelling, will we even consider imposing less than the most severe sanction of

disbarment in cases of stealing, dishonesty, fraudulent conduct ... whether occurring in the practice of law, or otherwise." *Vanderlinde*, 364 Md. at 414, 773 A.2d at 485. "A lawyer's conduct should conform to the requirements of the law, both in professional and personal affairs." MRPC, Preamble. In *Vanderlinde*, we said:

Early in the last half century, we noted our special concerns in regard to disciplinary matters involving dishonest conduct not arising out of an attorney's professional conduct, when we rendered a decision in which we disbarred an attorney for using slugs in parking meters.

*Vanderlinde*, 364 Md. at 389, 773 A.2d at 470 citing *Fellner v. Bar Ass'n of Baltimore City*, 213 Md. 243, 131 A.2d 729 (1957); *Attorney Griv. Com'n v. Sheinbein*, 372 Md. 224, 812 A.2d 981, 994–95 (2002) (disbarment was the appropriate disciplinary sanction for an attorney's conduct in encouraging and aiding his son in absconding to another country while the son was a murder suspect).

 Finally, respondent asserts that because the Attorney General declined to prosecute Traveler's claim for fraud, a crime has not been proven. Conviction of the crime is "not a necessary predicate to support a finding of dishonesty." *Attorney Griev. Comm'n v. Atkinson*, 357 Md. 646, 653, 745 A.2d 1086, 1091 (2000). We said in *Attorney Griev. Comm'n v. Deutsch*, 294 Md. 353, 450 A.2d 1265, 1273 (1982), that it does not matter whether the dishonest act is corroborated by admission or conviction, it calls for disbarment. Respondent's willful submission of false documentation to Traveler's to line her own pockets was dishonest. That she was not convicted of insurance fraud does not diminish the act. While respondent acknowledges her dishonesty, she believes that an appropriate sanction would be a 30–day suspension from the practice of law.

## III.

In our view the evidence supporting Bar Counsel's petition is unassailable. Respondent presented no testimony that

would cause us to question the hearing judge's findings of fact and conclusions of law. Respondent's dishonesty was willful, intentional and for her own personal gain. Bar Counsel recommends disbarment stating, "Respondent's dishonest and criminal conduct, [was] motivated by greed." There are no extenuating or mitigating circumstances as respondent's apparent medical "condition" occurred subsequent to her acts of dishonesty. Therefore, we hold that the appropriate sanction is disbarment.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–515(C), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST JERRY DENEISE JORDAN.*