69 A.3d 1092

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**John Edward COPPOCK, Jr.**

**Misc. Docket AG No. 66, Sept. Term, 2011.**

Court of Appeals of Maryland.

July 9, 2013.

**630**

James P. Botluk, Assistant Bar Counsel (Glenn M. Grossman, Bar Counsel, Attorney Grievance Commission of Maryland), for Petitioner.

Henry J. Myerberg, Esquire (Jacobson & Myerberg, Towson, MD), for Respondent.

Argued before BELL, C.J.,* HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

McDONALD, J.

Most lawyers prize their integrity. The Maryland Lawyers' Rules of Professional Responsibility ("MLRPC") enforce that ideal by requiring truthfulness in statements to others during the course of representation[1] and candor toward tribunals[2] and by prohibiting dishonest conduct.[3] Human frailty being

---

\* Bell, C.J., participated in the hearing of the case, in the conference in regard to its decision and in the adoption of the opinion, but he had retired from the Court prior to the filing of the opinion.

1. MLRPC 4.1.

2. MLRPC 3.3.

3. MLRPC 8.4(c).

what it is, not all lawyers tell the truth all the time. It falls to this Court in its capacity as the principal regulator of the legal profession in Maryland to distinguish those untruths that violate the MLRPC from those that do not. For example, this Court has held that a lawyer who lies to his mistress about his fidelity in matters of the heart does not violate the MLRPC, even if the mistress is also a client.[4] On the other hand, a lawyer who knowingly submits false documents to enhance an insurance claim concerning the lawyer's home is subject to discipline, even if the claim is not related to the lawyer's practice and the lawyer is not otherwise prosecuted.[5]

In this case, the Respondent, John E. Coppock, Jr., found himself in personal financial distress. Mr. Coppock sought a short-term loan, and represented that the funds would be used to defray litigation expenses in a case from which he anticipated a large attorney's fee. He ultimately obtained the loan from a private lender at a high interest rate and entered into a loan agreement that confirmed that the loan related to the litigation and that gave the lender a security interest in his attorney's fees from that case. The disbursement of his fee was later delayed, and the anticipated amount was reduced, as a result of a prolonged battle between Mr. Coppock and a former co-counsel over the division of the attorney's fees in the case. When Mr. Coppock ultimately received a portion of the fee owed to him—the funds in which he had given the lender a security interest—he used the money to make payments on other debts and misled the lender concerning the status of the fee dispute.

After receiving a complaint from the attorney for the lender, the Attorney Grievance Commission (the "Commission"), acting through Bar Counsel, charged Mr. Coppock with violating several of the MLRPC, including Rule 4.2(a) (communication with person represented by counsel), Rule 8.4(c) (conduct

---

4. *Attorney Grievance Comm'n v. Hall*, 408 Md. 306, 329–30, 969 A.2d 953 (2009).

5. *Attorney Grievance Comm'n v. Jordan*, 386 Md. 583, 599–600, 873 A.2d 1161 (2005).

involving dishonesty, fraud, deceit, or misrepresentation) and Rule 8.4(d) (conduct prejudicial to the administration of justice). The alleged violations arise out of Mr. Coppock's interactions with the attorney and the creditor.

Pursuant to Maryland Rules 16–752(a) and 16–757, we referred the matter to Judge Nancy M. Purpura of the Circuit Court for Baltimore County to conduct a hearing and provide findings of fact and recommended conclusions of law.

The parties agreed to nearly all of the material facts of the case. Based on those facts, the hearing judge concluded that, in communicating directly with the lender on his own behalf, Mr. Coppock had not communicated with a represented person *on behalf of a client* and therefore did not violate Rule 4.2. The hearing judge also concluded that, although Mr. Coppock had admittedly deceived the lender, his misrepresentations were unrelated to his fitness to practice law and therefore did not violate Rule 8.4(c) or 8.4(d). The Commission filed exceptions with respect to the judge's conclusions concerning alleged violations of Rule 8.4(c) and 8.4(d).

We sustain the Commission's exception as to the violation of Rule 8.4(c) and hold that Mr. Coppock's admitted misrepresentations were sufficiently related to his practice of law to merit professional discipline. Under the circumstances of this case and in light of the mitigating facts found by the hearing judge, the appropriate sanction is a reprimand.

### Background [6]

After a career in the United States Army Corps of Engineers and Maryland National Guard, Mr. Coppock was admitted to the Maryland Bar on June 24, 1999. He practiced for a year in Bel Air, until his National Guard unit was mobilized and sent to Bosnia–Herzegovina as part of a multinational peacekeeping force. In November 2011, he was featured in an

---

**6.** This section is based on the findings of fact made by the hearing judge and on other facts contained in a stipulation of facts submitted by the parties.

article in the military publication *Stars And Stripes* for his work to protect Bosnian children from land mines.

*The Thurmont Litigation*

Mr. Coppock returned to Maryland in 2002 and joined a firm that handled personal injury cases. In 2003, he began representation of eight families from Thurmont in a lawsuit against the Town concerning damages to their homes allegedly caused by improperly installed and maintained sewer systems. In his previous career with the Army Corps of Engineers, Mr. Coppock had experience installing such systems and therefore felt qualified to investigate the situation and to represent the families in their claims against the Town. He subsequently left the law firm and began a solo practice in which he continued to represent the Thurmont families.

In connection with the Thurmont case, Mr. Coppock hired engineering and real estate experts and enlisted as co-counsel Brian Jablon, an attorney whose practice dealt with construction and real estate issues. Mr. Jablon was surprised to find that Mr. Coppock's fee agreement was uncommonly advantageous to the clients. According to Mr. Jablon, contingency arrangements in such cases typically provide for a fee of between one-third to 40 percent of the award, but Mr. Coppock had agreed to accept only 25 percent of any recovery.

Mr. Jablon estimated that the case consumed most of Mr. Coppock's time and that he spent hundreds of hours in preparation for trial, to the exclusion of other potential legal work. Ultimately, this made it increasingly difficult for Mr. Coppock to pay his debts, including student loans, multiple mortgages on two properties, and credit card balances. However, Mr. Coppock remained confident that the fee from the Thurmont litigation would eventually prove these efforts and sacrifices worthwhile.

Two weeks before the trial of the Thurmont case, Mr. Coppock obtained the help of a third attorney, Loyd Hopkins,[7]

---

7. Although the hearing judge's fact findings spell Mr. Hopkins' first name as "Lloyd," documents in the record of this case and the attorney listing of this Court indicate that his name is spelled "Loyd."

who had successfully represented plaintiffs in a similar sewage-related case. After a 10–day trial in May 2007, a jury returned a verdict in favor of the plaintiffs against the Town in the amount of $3.5 million—an amount later remitted by the trial court to $2.6 million. The Town appealed, and the plaintiffs cross-appealed concerning the remission. As the appeal delayed Mr. Coppock's collection of his fee, he sought a loan from a bank in order to cover his mounting personal expenses.

*Loan Agreement and Mr. Levine's Fee*

Mr. Coppock's efforts to obtain a bank loan proved unsuccessful. In early December 2007, he sought assistance from a physician acquaintance in locating other sources of funds. In an e-mail to the physician, Mr. Coppock indicated that the loan was related to the Thurmont litigation. Mr. Coppock wrote that he and Mr. Jablon had agreed to advance costs for various experts in the Thurmont case, that they were making payments with respect to those costs, and that they now wished to pay off those costs. Mr. Coppock wrote that he was seeking a $125,000 "advance" on the anticipated attorneys' fees, was willing to pay a "20% flat rate," and anticipated that the matter would be resolved in three or four months.

The physician put Mr. Coppock in touch with Stephen Simons, who was engaged in the business of making high-risk, high-interest loans. Mr. Simons agreed to provide a loan in the amount of $125,000 and the transaction was consummated on December 18, 2007, under documents drafted by Mr. Simons' attorney, Stuart Levine. Pursuant to the promissory note, Mr. Coppock promised to pay back the principal plus $25,000 in interest by June 18, 2008, with the right to extend the due date by 30 days up to six times by paying $2,500 for each extension.[8]

---

**8.** Although interest in the amount of $25,000 was 20 percent of the principal of the loan ($125,000), the repayment period was six months and the extensions for six subsequent months would cost $2,500 per month, which would result in a total of $40,000 in "interest" payments over the course of a year—effectively, an annual rate of 32 percent if the loan was repaid after a year. At the hearing, Mr. Coppock testified

In a related loan and security agreement, Mr. Coppock also agreed to pay Mr. Levine's fees related to preparing the loan documents and agreed to a confessed judgment in the event of default. The loan and security agreement recited that the funds were to be used for Mr. Coppock's expenses related to the Thurmont litigation and it provided Mr. Simons with a guaranteed first security interest on any attorney's lien Mr. Coppock had on the Thurmont plaintiffs' recovery.[9] It further provided that Mr. Coppock would not create or permit any other encumbrance on that lien. In the agreement, Mr. Coppock promised to keep Mr. Simons informed of the status of the Thurmont litigation, including the resolution of the appeal, the defendant's payment of the judgment, and the collection of attorney's fees.

Later that month, Mr. Levine sent Mr. Simons an invoice for work performed in connection with the loan, which Mr. Simons forwarded to Mr. Coppock for payment per the loan and security agreement. Two months later Mr. Levine had not received payment and he inquired as to the status of the payment. Mr. Coppock initially e-mailed Mr. Levine that he had already sent him a check for the amount of the invoice, but in fact he had not done so. When Mr. Levine wrote back that he had not received the check, Mr. Coppock responded in an e-mail questioning the accuracy of the invoice. Mr. Levine responded with an angry and insulting e-mail that repeatedly called Mr. Coppock a "liar." [10] Mr. Coppock paid Mr. Levine's

that Mr. Simons had "doubled" the rate of interest that Mr. Coppock had originally proposed.

9. The agreement was also executed by Mr. Jablon, who agreed to subordinate any interest he or his law firm had in the plaintiffs' recovery to Mr. Coppock's interest.

10. At the hearing, Mr. Coppock testified, and the hearing judge found, that he had misled Mr. Levine about having sent the check only *after* receiving Mr. Levine's "over the top" response in order to buy time to obtain advice from another attorney about the matter. However, the parties' stipulation of facts and the records attached to the stipulation demonstrate that Mr. Coppock's false statement about mailing the

invoice soon after and had no further dealings with Mr. Levine until 2010, although Mr. Coppock periodically communicated directly with Mr. Simons about payments on the loan.

*Extension and Modification of the Loan; Missed Payments*

In June and July of 2008, Mr. Coppock extended the repayment date of the loan, pursuant to the terms of the loan and security agreement. On August 17, he asked Mr. Simons for yet another extension and a modification of the terms of the loan. The two agreed to apply the accrued interest and the latest extension payment to the principal, for a total of $152,500, with a new due date of September 18, 2008. After September 18, interest would accrue at $84.72 per day; Mr. Coppock could extend the loan monthly for up to three months by paying the accrued interest to that point ($2,541.67). In September, Mr. Coppock mistakenly paid $2,500 for the extension, $41.67 less than what had been agreed to. He later sent the additional amount, albeit after the September 18 deadline. In October 2008, Mr. Coppock sent a late payment of $2,600 for another extension.

In November, however, Mr. Coppock did not make any payment and did not respond to Mr. Simons' e-mailed requests for payment. On December 7, 2008, Mr. Simons sent Mr. Coppock an e-mail stating that the balance on the loan had grown to $154,305.56.

*Settlement of Litigation; Fee Dispute*

In the meantime, the parties in the Thurmont litigation had agreed to settle the case for $2,665,000, from which Mr. Coppock expected to receive approximately $542,000 in attorney's fees. The Town paid the settlement on December 9, 2008. The following day, Mr. Coppock sent Mr. Simons an e-mail stating that the case had settled and advised that the plaintiffs' releases of the attorney's fees would be signed within three days. The two agreed to meet on December 17 so that Mr. Coppock could pay off the balance on the loan.

---

payment occurred more than a month prior to Mr. Levine's e-mail, which references Mr. Coppock's false statement repeatedly.

On December 16, Mr. Coppock and Mr. Simons agreed to postpone their meeting until December 19.

A glitch arose, however. Mr. Hopkins and Mr. Coppock had a disagreement about the proper split of the attorneys' fees, and Mr. Hopkins sought to persuade their clients to withhold Mr. Coppock's portion of the fee. Some of the clients eventually signed a new fee agreement with Mr. Hopkins declaring all prior fee agreements null and void. On December 16, 2008, Mr. Hopkins sent a letter offering Mr. Coppock $100,000 as his share of the fee in the case. Mr. Hopkins wrote that "[a] blind man can see" that it was a beneficial offer and:

> an insane man would refuse it. I won at trial, not you. I settled the cases, not you and the clients respect and revere me not you. Get over it. Take your one hundred thousand dollars ($100,000.00) and make guitars,[11] the law and litigation is not your forte. Not nice but true. You do not have the law, facts or clients on your side so be rational, be logical, hate me and enjoy your money.

On December 18, 2008, Mr. Coppock told Mr. Simons that he now expected to receive his fee and to be able to repay the loan within the following five days. However, he did not pay Mr. Simons by December 23. During the next three months, Mr. Coppock continued to advise Mr. Simons that he was still arranging to collect his fee.

*Receipt of Part of Attorney's Fee*

On March 16, 2009, Mr. Coppock received a letter from most of the Thurmont clients informing him that they would not pay him a fee. Two families who did not agree with Mr. Hopkins' plan paid Mr. Coppock fees totaling $57,771.42 the next day. Contrary to the loan and security agreement, Mr. Coppock did not inform Mr. Simons that he had received these funds, which were subject to Mr. Simons' security interest.

---

11. This is apparently a reference to Mr. Coppock's undergraduate degree in music and his previous experience as a high school music teacher.

Nor did he use any of that money to make a payment on the loan. Rather, he used the money to make payments on his mortgages, credit card bills, student loans, and a car loan.

*Misrepresentations to Mr. Simons; Receipt of Remainder of Fee*

On March 18, 2009, Mr. Coppock told Mr. Simons that he was in a fee dispute with the Thurmont clients, although he did not disclose that he had received a partial payment. Meanwhile, in an attempt to recover his fees from one family, Mr. Coppock made a claim in that family's bankruptcy proceedings—first as a special counsel to the debtor's estate and then as a creditor. The bankruptcy court denied both claims, effectively barring Mr. Coppock from receiving a fee from that client. Mr. Coppock did not inform Mr. Simons of that development.

On June 3, 2009, Mr. Coppock finally disclosed to Mr. Simons that one of his co-counsel had persuaded their clients not to release his fee, although he still did not disclose the payment he had already received.

Mr. Coppock next attempted to recover his fees by filing an interpleader action in the Circuit Court for Frederick County. After Mr. Simons' repeated inquiries about the status of his attempts to recover the fee, Mr. Coppock on November 11, 2009, blamed the delay on a postponed hearing, though no hearing of any kind was, or ever had been, scheduled.

Eventually, as a result of the interpleader action, Mr. Coppock received $221,160.67 from the remaining clients on February 24, 2010, minus a fee paid to his attorney in that case. Despite this, Mr. Coppock told Mr. Simons on March 15, 2010, that "no progress" had been made in obtaining his fee and misrepresented the amount of funds that could be recovered in the fee dispute.

*Discovery of Misrepresentations*

The next month, on April 5, 2010, Mr. Coppock wrote Mr. Levine about his loan with Mr. Simons, offering to negotiate a new interest rate and to resolve the loan. Mr. Levine, who

had apparently discovered that attorney's fees had been released in the Thurmont case, wrote back that Mr. Coppock had misled Mr. Simons into believing that he had not received any distributions from the Thurmont litigation. Mr. Levine proposed that Mr. Coppock turn over to him all of the fees received from the Thurmont litigation; from that sum Mr. Levine would remit the principal amount of the loan to Mr. Simons and would hold the rest in escrow pending negotiations about the amount of interest owed. Mr. Coppock declined, although he continued to attempt to contact both Mr. Simons and Mr. Levine to negotiate a settlement.

*Confessed Judgment; Bankruptcy; Complaint to Commission*

On May 10, 2010, Mr. Levine filed suit on behalf of Mr. Simons in the Circuit Court for Baltimore County to enforce the confessed judgment note. After a judgment of $249,000 was entered against him, Mr. Coppock hired an attorney, Richard Hackerman, who filed a bankruptcy petition on Mr. Coppock's behalf on July 9, 2010.

On September 30, 2010, Mr. Levine filed a complaint concerning Mr. Coppock with the Attorney Grievance Commission.

*Settlement with Mr. Simons*

Mr. Levine and Mr. Hackerman engaged in negotiations to resolve Mr. Coppock's outstanding debt to Mr. Simons. In April 2011, Mr. Simons agreed to settle the outstanding debt for a total of $100,000 (not including $15,000 previously paid to him for extensions on the loan), to be paid in monthly installments over five years.

Although a written settlement agreement was drafted, it was not immediately executed when Mr. Levine insisted on adding language that, Mr. Hackerman believed, was related to the complaint Mr. Levine had filed against Mr. Coppock with the Commission. Mr. Hackerman eventually filed a motion for sanctions in the bankruptcy court seeking enforcement of the settlement, and the written agreement was executed

thereafter. Mr. Simons dismissed his lawsuit and Mr. Coppock dismissed his bankruptcy petition.

*Testimony Concerning Character and Motive*

At the hearing in this matter, in addition to testifying as to some of the underlying facts, both Mr. Jablon and Mr. Hackerman testified as to Mr. Coppock's character. Mr. Jablon, who had acted as co-counsel in five cases with Mr. Coppock by that time, testified that Mr. Coppock was a "stand-up guy" with strong moral values. Mr. Hackerman testified that Mr. Coppock was honest and truthful. Mr. Hackerman testified that he found Mr. Levine to be belligerent, threatening, and profane in their interactions, and said that Mr. Levine repeatedly called Mr. Coppock a "thief" and threatened to have him disbarred.

Mr. Coppock also testified on his own behalf. He recounted his military and engineering career, his decision relatively late in life to pursue a legal career, and the course of the Thurmont litigation. He described his focus on that case and his deteriorating financial condition. He admitted making the false statements outlined above and in the Commission's charges. He said that he agreed to the terms of the loan out of desperation and that he had been blindsided when most of the Thurmont families refused to pay him a fee. He said that he had felt intimidated by Mr. Simons and Mr. Levine and lied about his receipt of the attorney's fees that secured the loan in order to "buy time" to renegotiate the onerous terms of the loan.

*Hearing Judge's Conclusions of Law*

Based on these facts, the hearing judge concluded that Mr. Coppock had not committed any of the alleged violations. She noted that, with respect to the alleged violation of MLRPC 4.2, Mr. Coppock had been acting on his own behalf, and not representing a client, in his contacts with Mr. Simons concerning the loan. With respect to the alleged violations of Rule 8.4(c) and (d), the hearing judge concluded that Mr. Coppock's deceptions were unrelated to his fitness to the practice law. Analogizing this case to the situation in *Attorney Grievance*

*Comm'n v. Hall,* 408 Md. 306, 969 A.2d 953 (2009),[12] the hearing judge explained: "Lying to one's bill collector is akin to lying to one's mistress. While it may have been dishonest, a breach of his agreement with Simons, and an undesirable thing to do, it was wholly unrelated to Respondent's fitness to practice law." The hearing judge also noted that Mr. Coppock's travails were due, in part, to his decision to bring in more experienced counsel in the Thurmont litigation for the benefit of his clients. She also concluded that the conduct of Mr. Simons and Mr. Levine, including Mr. Levine's uncivil correspondence, was responsible for Mr. Coppock's state of mind, had significantly contributed to the conduct complained of, and had violated Maryland Code, Commercial Law Article ("CL"), § 14–202 (prohibited acts under Maryland Consumer Debt Collection Act).[13]

---

**12.** In that case, this Court held that an attorney's lies to a woman about his fidelity in their romantic relationship were unrelated to the practice of law and did not violate Rule 8.4(c), even though the woman was also a client. However, the Court found that the attorney's representation of the woman violated numerous other provisions of the MLRPC, including provisions concerning conflicts of interest, and indefinitely suspended the attorney from the practice of law with a right to reapply after 24 months.

**13.** That provision states:

In collecting or attempting to collect an alleged debt a collector may not:

(1) Use or threaten force or violence;

(2) Threaten criminal prosecution, unless the transaction involved the violation of a criminal statute;

(3) Disclose or threaten to disclose information which affects the debtor's reputation for credit worthiness with knowledge that the information is false;

(4) Except as permitted by statute, contact a person's employer with respect to a delinquent indebtedness before obtaining final judgment against the debtor;

(5) Except as permitted by statute, disclose or threaten to disclose to a person other than the debtor or his spouse or, if the debtor was a minor, his parent, information which affects the debtor's reputation, whether or not for credit worthiness, with knowledge that the other person does not have a legitimate business need for the information;

(6) Communicate with the debtor or a person related to him with the frequency, at the unusual hours, or in any other manner as reasonably can be expected to abuse or harass the debtor;

The hearing judge also briefly offered some observations as to mitigating circumstances, in the event this Court determined that Mr. Coppock has violated the disciplinary rules. She noted that he had been fully cooperative with the Commission throughout the disciplinary process, had not been previously disciplined, had a reputation for honesty and integrity in the legal community, had served his country in the Army, and had gone to great lengths to advance the best interests of his clients. She concluded that "Respondent is an asset to the legal community, albeit a poor manager of personal funds."

### Discussion

Neither party has excepted to the hearing judge's findings of fact, as there was little dispute as to the underlying facts at the hearing. The Commission has filed three exceptions relating to the hearing judge's conclusions of law; Mr. Coppock has not filed any exceptions to the conclusions of law.

*Exception as to Statement Concerning CL § 14–202*

The Commission excepts to the hearing judge's statement, in a footnote, that Mr. Simons and Mr. Levine violated CL § 14–202 of the Maryland Consumer Debt Collection Act. As noted by the Commission, CL § 14–201 defines a "collector" as a person collecting or attempting to collect an alleged debt arising out of a consumer transaction—*i.e.*, one "involving a person seeking or acquiring real or personal property, services, money, or credit for personal, family, or household purposes." Because the loan agreement between Mr. Coppock and Mr. Simons stated that the loan was a commercial loan, the Commission argues, the statute does not apply. Mr.

---

(7) Use obscene or grossly abusive language in communicating with the debtor or a person related to him;

(8) Claim, attempt, or threaten to enforce a right with knowledge that the right does not exist; or

(9) Use a communication which simulates legal or judicial process or gives the appearance of being authorized, issued, or approved by a government, governmental agency, or lawyer when it is not.

CL § 14–202.

Coppock concedes that "it technically did not violate section 14–202." However, he emphasizes the hearing judge's implicit finding [14] that the true purpose of the loan was to defray Mr. Coppock's personal expenses.

Neither party mentioned CL § 14–202 at the hearing or presented evidence or argument specifically addressed to a potential violation of the Consumer Debt Collection Act. The two individuals who allegedly violated the statute are not parties in this proceeding, and did not testify at the hearing. In any event, this proceeding is not a forum for the adjudication of an alleged violation of the Consumer Debt Collection Act. Accordingly, we sustain the Commission's exception in that we express no opinion on whether that statute was violated in the circumstances of this case.

*Exception as to Alleged MLRPC Violations*

The Commission also excepted to the hearing judge's conclusions that Mr. Coppock did not violate Rule 8.4(c) or Rule 8.4(d).[15]

*MLRPC 8.4(c)*

■ Rule 8.4(c) provides that "[i]t is professional misconduct for a lawyer to ... engage in conduct involving dishonesty, fraud, deceit or misrepresentation." This proscription is not limited to conduct in the practice of law, but extends to actions by an attorney in business or personal affairs that reflect on the individual's character and fitness to practice law, as the official commentary to the rule makes clear. *See* Rule 8.4(c), Comment [2] (while some offenses involving "moral

---

14. The hearing judge did not specifically mention, in her findings of fact, Mr. Coppock's admitted representations in his e-mail to his physician seeking a referral to a lender and in the loan documents that the loan was for the purpose of financing costs of the Thurmont litigation. She did find that Mr. Coppock was experiencing personal financial difficulties and obtained the loan after failing to obtain a personal loan from other sources.

15. The Commission did not take exception to the hearing judge's conclusion that, because Mr. Coppock's direct communications with Mr. Simons were not on behalf of a client, he did not violate MLRPC 4.2(a).

turpitude" have no specific connection to the practice of law, other seemingly minor offenses, in some circumstances, "can indicate indifference to legal obligations"); *see also* MLRPC, Preamble: A Lawyer's Responsibilities [3] ("a lawyer who conducts fraud in the conduct of a business is subject to discipline for engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation").

Mr. Coppock admits that he lied repeatedly to Mr. Simons about the status of the attorney's fees in the Thurmont litigation—in particular, his failure to disclose the receipt of those funds in response to inquiries and his personal use of the funds that were the subject of the security interest. Those misrepresentations had been preceded earlier in their relationship by his false statements as to the purpose for which he was seeking the loan [16] and concerning his payment of the attorney's fee related to the loan. As noted above, the hearing judge concluded that these misrepresentations were unrelated to Mr. Coppock's fitness to practice law. She also reasoned that the conduct of Mr. Simons and Mr. Levine "generated" Mr. Coppock's state of mind and contributed significantly to his decision to mislead them.

It may well be, as the hearing judge found, that Mr. Coppock's desire to obtain a loan derived from his personal financial distress involving mortgages, student loans, credit card bills, and other personal liabilities. Perhaps Mr. Simons

---

**16.** It is undisputed that, in originally seeking the loan through his physician before he had ever encountered Mr. Simons or Mr. Levine, he represented that he was seeking the loan to finance litigation expenses related to the Thurmont case. The loan and security agreement that he entered into with Mr. Simons likewise represented that the loan was for commercial purposes—in particular, for the purpose of financing the Thurmont litigation.

At the hearing, Mr. Coppock stated that "everyone knew" he was seeking the loan for personal, not litigation-related, expenses. Apart from that uncorroborated assertion, there is no other evidence in the record that his physician, Mr. Simons, or Mr. Levine knew from the outset that the loan would not be used for the purposes Mr. Coppock had originally stated. In any event, Mr. Coppock himself clearly admitted that he made material false statements, both in the loan documentation and in his subsequent dealings with Mr. Simons.

and Mr. Levine were overbearing, or possibly violated some law relating to the loan and its collection. But the response by an attorney to such provocation, if there was such, should respect legal processes. "A lawyer's conduct should conform to the requirements of the law . . . in the lawyer's business and personal affairs. . . . While it is a lawyer's duty, when necessary, to challenge the rectitude of official action, it is also the lawyer's duty to uphold legal process." MLRPC, Preamble: A Lawyer's Responsibilities [5]. If Mr. Coppock believed that the loan, or the attempts to collect it, violated legal norms, such as the Consumer Debt Collection Act, as suggested by the hearing judge, remedies were available under that law, *see* CL § 14–203, and possibly under the Consumer Protection Act, *see* CL § 13–301(14)(iii). If the stress of his personal financial situation threatened to overwhelm him, the law offers the option of bankruptcy, a course he later adopted when his misrepresentations were discovered.

Here Mr. Coppock made use of his legal practice to obtain a loan and gave a security interest in an expected fee from his practice. After expending the funds on personal debts, he misrepresented the results of his practice to avoid the payment of the loan or the collection of that collateral. This Court has previously held that an attorney's use of deception—in particular, concealing personal funds in an escrow account—to evade the attorney's creditors violated Rule 8.4(c). *See Attorney Grievance Comm'n v. Velasquez,* 301 Md. 450, 483 A.2d 354 (1984); *Attorney Grievance Comm'n v. Foltz,* 411 Md. 359, 983 A.2d 434 (2009); *Attorney Grievance Comm'n v. Powell,* 369 Md. 462, 800 A.2d 782 (2002); *Attorney Grievance Comm'n v. Snyder,* 368 Md. 242, 793 A.2d 515 (2002). It is true, however, that in each of those cases, the respondents also engaged in additional sanctionable behavior that affected clients while in this case, as the hearing judge found, Mr. Coppock attended to the interests of his clients to his own detriment—a factor that we shall take into account in imposing a sanction.

Accordingly, we sustain the exception of the Commission as to the violation of Rule 8.4(c). Our decision should not be

taken to mean that every dispute that an attorney may have with one who provides funds, goods, or services to the attorney in connection with the attorney's legal practice implicates the rules of professional responsibility. We do not countenance misuse of the grievance process, or the threat of a complaint, as a collection device for an attorney's personal or professional debts. In such disputes, however, an attorney has a particular obligation to prosecute or defend the matter through the appropriate legal processes and not to deliberately mislead and deceive those with whom the attorney does business.

*MLRPC 8.4(d)*

■ Rule 8.4(d) provides that "[i]t is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." In assessing alleged violations of Rule 8.4(d) not involving conduct directly related to the practice of law, this Court has noted that "[o]nly when such purely private conduct is criminal or so egregious as to make the harm, or potential harm, flowing from it patent will that conduct be considered as prejudicing, or being prejudicial to, the administration of justice." *Attorney Grievance Comm'n v. Link*, 380 Md. 405, 429, 844 A.2d 1197 (2004).

The Commission focuses on Mr. Coppock's failure to respect the security interest in the Thurmont attorneys' fees that he had granted to Mr. Simons and concludes that such conduct is prejudicial to the administration of justice. The Commission also notes that Mr. Simons was forced to collect on his loan through civil litigation and the bankruptcy court. Mr. Coppock's decision to pay off other personal debts other than the loan from Mr. Simons with his proceeds from the Thurmont case certainly breached the loan agreement between the two. But that decision did not equate to a criminal misappropriation of funds. Nor is there any indication in the record that the bankruptcy petition was fraudulent, or undertaken for any reason other than Mr. Coppock's inability to pay his debts. Ultimately, the debt to Mr. Simons was settled for a reduced

payment over five years. Such is the occasional and not-unexpected result for those who engage in the business of making high-risk, high-interest loans to individual borrowers. Therefore, we agree with the hearing judge's conclusion that Mr. Coppock's actions did not violate Rule 8.4(d).

## Sanction

"[T]he well settled purpose and goal of attorney discipline proceedings is to protect the public." *Attorney Grievance Comm'n v. Wingerter*, 400 Md. 214, 234, 929 A.2d 47 (2007). In assessing an appropriate sanction, this Court often refers to certain aggravating and mitigating factors applicable to attorney discipline suggested by the American Bar Association. Only one of the aggravating factors appears to pertain to this case—prior disciplinary offenses.[17] Mr. Coppock has been the subject of prior discipline in the form of a Commission Reprimand during Fiscal Year 2011 for his negligent failure to maintain client trust funds in trust to pay a medical provider and for his improper disbursement of those funds to himself and another client. The parties have stipulated that the prior discipline involved negligent, but not dishonest, conduct.

---

17. The aggravating factors are:
   (a) prior disciplinary offenses;
   (b) dishonest or selfish motive;
   (c) a pattern of misconduct;
   (d) multiple offenses;
   (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;
   (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
   (g) refusal to acknowledge wrongful nature of conduct;
   (h) vulnerability of victim;
   (i) substantial experience in the practice of law;
   (j) indifference to making restitution;
   (k) illegal conduct, including that involving the use of controlled substances.
   American Bar Association, *Standards for Imposing Lawyer Sanctions*, § 9.22, Compendium of Professional Responsibility Rules and Standards (2012) at p. 475.

On the other hand, several mitigating factors apply.[18]   Mr. Coppock was cooperative with the Commission and is apparently admired by his peers.  The hearing judge, who had the opportunity to observe Mr. Coppock and the character witnesses who testified on his behalf and was apparently greatly impressed, concluded that he is an "asset to the legal community."  The hearing judge also credited his statement that he felt intimidated by the lender and the lender's attorney. While this does not excuse his misconduct, it does indicate that it was reactive rather than premeditated.

The Commission urges that we disbar Mr. Coppock.  We have found that the loan was not so unrelated to Mr. Coppock's fitness to practice law as to absolve him of the charged violation of Rule 8.4(c).  But it is undisputed that the misconduct did not adversely affect any client and, as the hearing judge concluded, may have resulted in part from placing the

---

**18.**   The mitigating factors are:

   (a)  absence of a prior disciplinary record;

   (b)  absence of a dishonest or selfish motive;

   (c)  personal or emotional problems;

   (d)  timely good faith efforts to make restitution or to rectify consequences of misconduct;

   (e)  full and free disclosure to disciplinary board or cooperative attitude toward proceedings;

   (f)  inexperience in the practice of law;

   (g)  character or reputation;

   (h)  physical disability;

   (i)  mental disability or chemical dependency including alcoholism or drug abuse when:

   (1)  there is medical evidence that the respondent is affected by a chemical dependency or mental disability;

   (2)  the chemical dependency or mental disability caused the misconduct;

   (3)  the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation;  and

   (4)  the recovery arrested the misconduct and recurrence of that misconduct is unlikely;

   (j)  delay in disciplinary proceedings;

   (k)  imposition of other penalties or sanctions;

   (*l*)  remorse;

   (m)  remoteness of prior offenses.

American Bar Association, *Standards for Imposing Lawyer Sanctions,* § 9.32, Compendium at p. 476.

interests of his clients ahead of his own. Moreover, Mr. Coppock's false statements were not made to a client, to a tribunal, or to a person or party in litigation. They were not made in the context of a fiduciary relationship, but rather in the context of a contractual relationship with a lender.

On balance, a formal reprimand strikes the appropriate balance.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO RULE 16–761, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST JOHN EDWARD COPPOCK, JR.

BELL, C.J., dissents.

BELL, C.J., dissenting.

I would overrule Bar Counsel's exceptions and dismiss the charges against the Respondent.