*Attorney Grievance Commission v. Bruce Michael Smith*
Misc. Docket AG No. 3, September 2013 Term


**Attorney Discipline – Prosecutor's Failure to Diligently Carry out Obligations Regarding Victim in Child Sexual Abuse Case – Suspension.**  An indefinite suspension with the right to re-apply for admission to the bar no sooner than 60 days after the beginning of the suspension is the appropriate sanction for a former Assistant State's Attorney who failed to communicate at all with the victim or victim's representative in a child sexual abuse case to which he was assigned, with the result that (1) his office failed to comply with its constitutional and statutory obligations toward the victim, (2) he provided incorrect information to the Circuit Court in connection with a request to postpone the trial, (3) the sentencing court did not have the benefit of a victim impact statement at the time of sentencing, and (4) the child victim and victim's foster mother were not aware of the prosecution or of the probation condition requiring the defendant to have no contact of any kind with the victim.  MLRPC 1.3 and 8.4(a) & (d).

Circuit Court for Baltimore County
Case No. 13C13004267AG
Argued: November 10, 2014

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 3

September Term, 2013

ATTORNEY GRIEVANCE COMMISSION

OF MARYLAND

v.

BRUCE MICHAEL SMITH

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

Opinion by McDonald, J.
Harrell, Battaglia, and Watts, JJ., concur and
dissent.

Filed: February 23, 2015

State law requires that law enforcement authorities provide certain notices to victims and, in the case of a child victim, to the representative of the victim. Among other things, this requirement allows those specially affected by the criminal justice system to know its workings and perhaps participate in them. In particular, it provides an opportunity for the victim, or the victim's representative, to be heard at critical junctures in the case, such as sentencing, when the victim's perspective may be significant to the court's decision. This is an important responsibility of a prosecutor who, as the representative of the State, has a duty to ensure that "justice shall be done."[1]

This attorney disciplinary proceeding arises out of a criminal prosecution involving an alleged incident of child sexual abuse. Respondent Bruce Michael Smith, at the time an Assistant State's Attorney assigned to the Child Advocacy Center in Harford County, was the prosecutor. In that capacity, he was responsible for notifying the 10-year-old victim and her foster mother of their rights under State law, preparing them for the trial, and informing them of critical proceedings in the case. Mr. Smith concedes that he was woefully deficient in carrying out that responsibility with the result that neither the victim nor her foster mother was aware of the prosecution of the alleged assailant, they were not able to participate in sentencing following the defendant's *Alford* plea, and they were not aware of the conditions of the defendant's later release from custody that forbade any contact with the victim. Mr. Smith also concedes that his failure to communicate with the victim's foster mother resulted

---

[1] *Berger v. United States*, 295 U.S. 78, 88 (1935); *see* footnote 14 below.

in his giving incorrect information to the Circuit Court, which caused that court to postpone the original trial date.

We conclude that Mr. Smith failed to act with the reasonable diligence expected of a member of the bar and that his misconduct prejudiced the administration of justice. He is suspended indefinitely from the practice of law, with the right to re-apply no sooner than 60 days from the date that his suspension begins.

# I

## Background

### A. Legal Context - Child Victims and Victim Notification

1. Victim Notification Requirements

The Maryland Constitution confers on victims of crimes the right to be treated with "dignity, respect, and sensitivity" by agents of the State and to be notified and to participate in criminal proceedings, as may be permitted by implementing legislation. Maryland Declaration of Rights, Article 47.[2] The General Assembly has implemented this "strong

---

[2] Article 47, which was adopted in 1994, provides as follows:

> (a) A victim of crime shall be treated by agents of the State with dignity, respect, and sensitivity during all phases of the criminal justice process.

> (b) In a case originating by indictment or information filed in a circuit court, a victim of crime shall have the right to be informed of the rights established in this Article and, upon request and if practicable, to be notified of, to attend, and to be heard at a criminal justice proceeding, as these rights are

(continued...)

2

public policy" by enacting several statutes that create "a class of specific, but narrow, rights for victims." *Hoile v. State*, 404 Md. 591, 605, 948 A.2d 30 (2008). In particular, the Legislature has set forth certain guidelines for the treatment and notification of a victim. Maryland Code, Criminal Procedure Article ("CP"), §11-1002(b). In addition, it has required prosecuting attorneys, law enforcement officers, and certain judicial officials to notify victims of those guidelines. CP §11-104. When the victim is a minor or incompetent person, a "victim's representative" – defined as a close relative or guardian of the victim[3] – has similar rights under these statutes.

Under the statutory guidelines, victims are to be provided with certain services, amenities, information and notices, and opportunities to participate in the criminal process.[4] Pertinent to this case, a victim and a victim's representative, on written request, "should be kept reasonably informed by the police or the State's Attorney of the arrest of a suspect and the closing of the case, and should be told which office to contact for information about the

---

[2] (...continued)
> implemented and the terms "crime," "criminal justice proceeding," and "victim" are specified by law.
>
> (c)     Nothing in this Article permits any civil cause of action for monetary damages for violation of any of its provisions or authorizes a victim of crime to take any action to stay a criminal justice proceeding.

[3] *See* CP §11-1001(f).

[4] For example, the statute provides that, to the extent practicable, victims should be provided crisis intervention help and employer intercession services, and a waiting area in the courthouse separate from the suspect. CP §11-1002(b)(2), (5), (7).

3

case." CP §11-1002(b)(8). If the alleged crime is a "crime of violence," such as sexual abuse of a minor in certain circumstances,[5] the victim and victim's representative should be notified in particular of specified stages of the criminal case, including trial and disposition. CP §11-1002(b)(10). In addition, on request of the State's Attorney and in the discretion of the trial court, the victim and victim's representative may submit a victim impact statement and address the court at sentencing. CP §11-1002(b)(11). The victim and victim's representative also have certain rights as to notice when the defendant will be released from custody. CP §11-1002(b)(14)-(16).

To ensure that victims are aware of their rights, a law enforcement officer or District Court commissioner is to provide the victim or victim's representative with a pamphlet describing those rights on first contact. CP §11-104(b). Once charges have been filed and made public, the prosecutor is to provide the victim or victim's representative promptly with a copy of the pamphlet and a notification request form. CP §11-104(c). The prosecutor is to certify compliance with that requirement with the clerk of the court. *Id*. If the victim or victim's representative completes and files the notification request form, the prosecutor is, to the extent practicable, to give the victim or victim's representative prior notice of each court proceeding, of the terms of any plea agreement, and of the right to submit a victim impact statement in connection with sentencing. CP §11-104(e). In addition, that victim or

---

[5] *See* CP §1-101(e); Maryland Code, Criminal Law Article, §14-101(a)(16).

victim's representative "has the right to attend any proceeding in which the right to appear has been granted to a defendant." CP §11-102(a).

      2.      Child Advocacy Centers

To address what it found to be a lack of "necessary counseling and follow-up services" for sexual assault victims, the General Assembly directed the Governor's Office of Crime Control and Prevention ("GOCCP") to establish sexual assault crisis programs in the State, including child advocacy centers. CP §11-923. The State has designated 21 child advocacy centers throughout the State to provide a "coordinated multi-disciplinary approach to the problem of child abuse." Report of GOCCP on Child Advocacy Centers (January 1, 2015) at 1, available at <www.goccp.maryland.gov/victim/documents/annual-reports/CACS-2014.pdf>. The centers are to provide "safe, child friendly environments for forensic interviews and medical evaluations of the alleged child victim and offer continued support to the child." *Id*. The centers are to foster collaboration and "reduce existing gaps in services." *Id.* Pertinent to this case, the Harford County Child Advocacy Center ("Center") was established in 1993 and includes on its staff forensic interviewers, therapists, a pediatrician, local, county, and State law enforcement officers, and Assistant State's Attorneys. *See* <http://harfordcac.org/>.

## B. *Procedural Context*

On March 15, 2013, the Attorney Grievance Commission ("Commission"), through Bar Counsel, filed with this Court a Petition for Disciplinary or Remedial Action alleging

5

that Bruce Michael Smith violated various provisions of the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") in connection with a child sexual abuse case that he prosecuted while employed by the Harford County State's Attorney's Office and assigned to the Center. In particular, the Commission charged Mr. Smith with violating MLRPC 1.3 (diligence), 3.3 (candor toward a tribunal), and 8.4(a), (c), and (d) (misconduct). Pursuant to Maryland Rule 16-752(a), this Court assigned this disciplinary proceeding to Judge Ruth Ann Jakubowski of the Circuit Court for Baltimore County,[6] to conduct a hearing concerning the alleged violations and to provide findings of fact and recommended conclusions of law.

The hearing judge conducted an evidentiary hearing during October 2013, at which three witnesses, including Mr. Smith, testified, and at which the parties submitted a stipulation of facts as well as several documentary exhibits. The hearing judge filed a detailed Statement of Findings of Fact and Conclusions of Law in December 2013. Based on her findings of fact and analysis of the law, the hearing judge concluded that Mr. Smith had violated MLRPC 1.3, but had not violated MLRPC 3.3 or the various subsections of MLRPC 8.4.

The Commission did not except to the hearing judge's findings of fact, but did except to her conclusion that Mr. Smith did not commit all of the alleged violations; it offered alternative recommendations as to sanction, depending on how we dispose of those exceptions. Mr. Smith filed no exceptions or recommendation as to sanction.

---

[6] This Court initially designated Judge William O. Carr of the Circuit Court for Harford County, but upon request of that court re-assigned the case to Judge Jakubowski.

*C.*     *Factual Context*

Because the hearing judge's fact findings are uncontested, we treat them as established. Maryland Rule 16-759(b)(2)(A). The hearing judge's findings and the undisputed evidence in the record established the following facts.

*Bar Admission and Employment*

Mr. Smith was admitted to the Maryland Bar on December 16, 1999, and is also admitted to practice before the United States District Court for the District of Maryland. He is not a member of the bar of any other state or the District of Columbia.

After working for the Public Defender's Office, Mr. Smith was hired in 2007 as an Assistant State's Attorney for Harford County. He prosecuted cases in the District Court. He was also designated as one of the Assistant State's Attorneys assigned to the Center, which handled cases of child sexual assault and abuse, physical abuse and neglect, child pornography, and internet solicitation of children. As indicated earlier, the Center is also staffed by victim/witness advocates, a forensic interviewer, a family advocate, several detectives, a State trooper, and several child protective service workers.

*State v. Head*

In 2009, as part of his duties at the Center, Mr. Smith was assigned to prosecute the case of *State v. Nathan Elwood Head*, in which the defendant was charged with sexual abuse of a minor and a fourth degree sexual offense. According to documents in the State's Attorney's file, the 10-year old victim had been brought to the Center in February 2009 by

her foster mother. There, a social worker (assisted in some respects by a detective) interviewed the child in some detail concerning an alleged assault by Mr. Head, the 19-year old former boyfriend of her foster sister. The interview was recorded and transcribed, and the matters described by the victim formed the basis of the charges against Mr. Head. The social worker also recorded an interview with the foster sister which was also transcribed and placed in the file.

Charges were filed against Mr. Head, who was in custody on an unrelated charge. Mr. Smith was assigned to prosecute the case. Toward the end of April 2009, Mr. Smith received notice from the Circuit Court for Harford County that the trial would begin on September 8, 2009.

On September 8, Mr. Smith appeared in the Circuit Court and requested a postponement because, according to Mr. Smith, a "necessary, critical witness," the foster mother of the 10-year old victim, was not available. According to the transcript of that hearing, Mr. Smith stated that he believed the foster mother was in Connecticut for a medical emergency, but said, "I don't have my note with me." The trial judge heard from defense counsel, who said "it was [her] understanding that [they] weren't going to be reached for trial" that day, and did not object to the postponement. Finding good cause, the trial judge postponed the case until January 4, 2010 – well past the October 6, 2009 *Hicks* date.[7]

---

[7] Maryland Rule 4-271 requires that a criminal trial be scheduled within 180 days of the appearance of counsel or the defendant's first appearance before the circuit court, whichever is earlier, unless the trial date is postponed for good cause. The rule's deadline

(continued...)

8

On the new trial date, Mr. Smith again appeared at that proceeding as the prosecutor. The defendant entered an *Alford* plea[8] to a fourth degree sexual offense and was found guilty. The court then proceeded to sentencing. Mr. Head's attorney and his grandfather addressed the court on his behalf, but neither the victim nor her foster mother was present and the State did not offer a victim impact statement. Mr. Head was sentenced to one year imprisonment, with all but 142 days suspended and with credit for time served, and three years' probation As a special condition of his probation, Mr. Head was not to have any contact with the victim. There is no indication in the record that anyone from the State's Attorney's Office or the Center had contacted the foster mother to advise her of the proceeding prior to the sentencing; nor did anyone subsequently advise her of the conditions of Mr. Head's probation that related to the victim.

*Discovery of Non-Compliance with Victim-Related Responsibilities*

More than two years later, in March 2012, when Mr. Head was about to be released from custody, the Division of Correction called the State's Attorney's Office to obtain victim contact information and the State's Attorney's office volunteered to notify the victim. When

---

[7] (...continued)
for commencing trial is sometimes referred to colloquially as the "*Hicks* date" – a reference to *State v. Hicks*, 285 Md. 310, 318, 403 A.2d 356 (1979), in which this Court held that the sanction for a violation of the predecessor version of Rule 4-271 was dismissal of the charges. As noted above, if the court finds good cause for the postponement there is no violation of the rule.

[8] In an *Alford* plea, a defendant admits that the State has sufficient evidence to obtain a conviction, but does not admit to committing the crime. *See North Carolina v. Alford*, 400 U.S. 25 (1970).

9

the State's Attorney's Office contacted the foster mother (who had adopted the child in the meantime) to tell her that Mr. Head was being released from custody, it was surprised to learn that she had no idea that the case had been prosecuted.[9]  She had not heard anything from the Center or the State's Attorney's Office since reporting her daughter's allegations of abuse and assault.[10]

The State's Attorney himself then reviewed his office's file for *State v. Head* and the transcripts of the hearings in that case.  The file contained the transcribed interviews with the victim and her sister, counsels' entries of appearance, discovery requests, and the State's responses to discovery – including a list of potential witnesses that included the victim, her foster mother, a detective, and a social worker.  However, the note that Mr. Smith had referenced during the September 8, 2009 hearing when he requested a postponement was not in the file.

Several other items were also noticeably absent from the file.  The file did not contain a copy of the victim notification request form that the prosecutor is required to provide the victim.  Nor was there any indication whether a completed form had been returned by the

---

[9] The record does not indicate who at the State's Attorney's Office made the contact.

[10] It remains a bit of a mystery in this record as to why there was apparently no effort by anyone at the Center to follow up with the victim or her foster mother from the time of her interview in February 2009 until three years later.  In any event, Mr. Smith was as emphatic in taking responsibility for the State's lack of communication with the victim as he was in denying that he intentionally misled the trial court.  He testified that "it is without question that that responsibility rested on my shoulders.  Whether it was assigned to administrative staff or not, I'm responsible for ensuring that it's getting done and it did not get done."

victim or whether Mr. Smith had filed the required certification with the court attesting that the form had been sent to the victim. While the file included summonses for the defendant and the investigating detective, there were no summonses for the victim or her foster mother.[11]

According to the State's Attorney, the prosecutor of a child abuse case is responsible for meeting with the victim to prepare the child for trial, and the office commonly files a notice of intent to use a child victim's recorded statement at trial. Mr. Smith had apparently neither met with the victim nor attempted to introduce her statement. There was no indication in the prosecutor's file in the *Head* case of any communication with the victim or her foster mother between September 8, 2009, the date of the postponement, and the new trial date, January 4, 2010.

*Confrontation and Termination of Employment*

After being informed that the victim was unaware of the *Head* prosecution and after reviewing the office file and court file in that case, the State's Attorney confronted Mr. Smith about his handling of the case, his lack of communication with the victim, and his representations to the trial court that a key witness was unavailable, despite the fact that Mr. Smith had apparently never spoken with her. Mr. Smith, who was visibly shaken at the meeting, told the State's Attorney that the note he had referenced at the postponement

---

[11] According to the Harford County State's Attorney, the clerical staff in his office prints summonses for each trial, and the attorney assigned to the case reviews and signs them before sending them out.

11

hearing two and a half years earlier should be in the case file, but could not offer any other explanation. The State's Attorney requested, and received, Mr. Smith's immediate resignation. He then reported the incident to the Commission, which ultimately led to this proceeding.

*The Hearing in this Proceeding*

At the hearing in this proceeding, Bar Counsel presented the testimony of the State's Attorney and the victim's foster mother. The hearing judge found both to be credible witnesses. In addition, Bar Counsel introduced the State's Attorney's file, excerpts from the court file in the *Head* case and Bar Counsel's deposition of Mr. Smith, transcripts from the court hearings, and a stipulation of facts concerning Mr. Smith's career and the *Head* case.

In his testimony, the State's Attorney described the nature of the Center and the prosecutor's general function there, provided some background information concerning Mr. Smith's employment with his office, and detailed the results of his own investigation into the handling of the *Head* case. Among other things, the State's Attorney testified that a trial attorney is to make some kind of contact with the victim concerning the disposition of a case. If the victim is not present at the disposition, a letter is to be sent detailing the outcome or a victim advocate makes contact with the victim or the victim's representative.[12]

---

[12] The State's Attorney testified regarding the usual practice in the Child Advocacy Center of contacting victims after trial as follows:

Bar Counsel:   All right. Was it Mr. Smith's responsibility to notify the victim of the, of disposition of the charges against Mr.

(continued...)

12

The victim's foster mother testified as to the events that led her to believe that Mr. Head had sexual contact with her foster daughter and her decision to take the victim to the Center. At the Center she had consented to the audio and video taping of the social worker's interview of the victim. The foster mother said that she did not hear anything further about the case from anyone at the Center or at the State's Attorney's office. She said that she did not initiate any further contact herself on the assumption that the matter had been dropped after their visit to the Center. When contacted three years later about the release of Mr. Head, she was surprised to learn of the prosecution. She said she would have cooperated in the prosecution, had she known about it. She said she had not told anyone at the State's Attorney's Office that she would be unable to attend a hearing or trial in the case.

Mr. Smith did not cross-examine either of the Commission's witnesses. He testified on his own behalf and was cross-examined by Bar Counsel. The hearing judge concluded that he appeared to be "credible, genuine and truthful" in that testimony.

---

[12] (...continued)

                            Head?

[State's Attorney]:  I mean, generally with these kind of cases, the attorney does make some kind of contact but we also have a system where a letter, if the victim is not present in Court, there is a letter sent to the victim detailing the outcome of the case and often either one of the – because of the contacts with the victim, the victim advocate or family advocate makes contact and let [sic] them know what the outcome is.

13

Mr. Smith testified that he had no independent memory of the case but had refreshed his memory by reviewing the file. Concerning his lack of communication with the victim, Mr. Smith said his normal practice was to wait until the eve of trial to prepare a child victim for testifying, in order to minimize the child's trauma and exposure to the criminal process. The substance of the victim's testimony was already detailed in the transcription of her interview with the Center's social worker. According to Mr. Smith, he would have expected the victim to testify on September 9, but that changed when he sought a postponement on September 8, which was why he never held a pre-trial interview with her. By the January trial date, he knew he had reached a plea deal with the defendant, so once again he did not need to bring the victim in to prepare for trial. Like the State's Attorney, Mr. Smith alluded to the fact that victim's advocates at the Center would communicate with victims, but admitted that he bore responsibility for the fact that no one had contacted the foster mother.[13]

---

[13] At the hearing, the following exchange took place:

Bar Counsel:      Based on your review of the file, what was it that you had done to alert [the foster mother] that there was going to be a trial on September the 8th of 2009?

Mr. Smith:        I – there's nothing that shows in the file any contacts. I have no idea what did or did not take place with that. I have no idea whether any of the victim advocates had either attempted to contact her or did not contact her.

Bar Counsel:      But it was your job to –

Mr. Smith:        Ultimately it was my responsibility to ensure that that would take place, yes.

14

With respect to the postponement of the initial trial date, Mr. Smith said that someone gave him a note that the foster mother was unavailable for the original trial date. He admitted that the note was not in the file and that there was no evidence in the file of a subpoena for the victim or her foster mother, a victim notification form, or a certification to the court that he had sent the form. While he did not dispute the foster mother's testimony that she would have been available for a September 2009 trial, he denied a suggestion by Bar Counsel that he had fabricated the idea of a note in order to postpone the case because he was unprepared for trial. On cross-examination, he stated that he had been carrying a heavy District Court caseload at that time and had asked that it be reduced so that he could devote more time to his work at the Center.

*Hearing Judge's Conclusions as to Alleged Violations*

The hearing judge found that Mr. Smith failed to exercise reasonable diligence in carrying out his responsibilities in the *Head* case but that he did not intentionally deceive the trial judge in seeking a postponement of the initial trial date. The hearing judge concluded that Mr. Smith's admitted lack of diligence was a violation of MLRPC 1.3, but that in the absence of clear and convincing evidence that he intended to deceive the trial court, he had not violated MLRPC 3.3 or 8.4(a), (c), or (d).

15

# II

## Discussion

This Court reviews a hearing judge's conclusions of law *de novo* – *i.e.*, without any special deference. Maryland Rule 16-759(b)(1). In the course of that review, we consider any exceptions filed by the parties. As noted above, Mr. Smith did not file any exceptions. The Commission excepted to the hearing judge's conclusions that Mr. Smith violated only MLRPC 1.3 and not the other rules cited in the charged violations. We discuss each of the alleged violations in turn.

### *Lack of Diligence – MLRPC 1.3*

Under MLRPC 1.3, a lawyer is to "act with reasonable diligence and promptness in representing a client." Unreasonable delay and procrastination in the discharge of one's duties to a client may result in irreversible prejudice. *See* MLRPC 1.3, comment [3]. Although neither the victim nor her foster mother was a "client" of Mr. Smith, as the Assistant State's Attorney assigned to the *Head* case, he was "the representative not of an ordinary party to a controversy, but of a sovereignty ... whose interest ... in a criminal prosecution is ... that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935);[14] *see also Attorney Grievance Comm'n v. McDonald*, 437 Md. 1, 46, 85 A.3d 117

---

[14] In an oft-quoted passage, the Supreme Court described the role of the prosecutor:

> The [prosecutor] is the representative not of an ordinary party to
> a controversy, but of a sovereignty whose obligation to govern
> impartially is as compelling as its obligation to govern at all; and

(continued...)

16

(2014) (a prosecutor is "held to even higher standards of conduct than other attorneys due to [the] unique role as both advocate and minister of justice") (citation and quotation marks omitted). In that capacity, Mr. Smith was responsible for ensuring compliance with the State's victim notification law in order to properly carry out his responsibilities as the prosecutor in the *Head* case.

Mr. Smith agrees that he had ultimate responsibility for compliance with the victim notification obligations – provision of the victim notification form to the victim and her foster mother, communication with the victim and her foster mother about key dates in the prosecution, notification of the foster mother of the disposition of the case and the probation condition that barred Mr. Head from contact with the victim. He concedes that he did none of those things. In connection with the request to postpone the trial, he also concedes that he did not use "due diligence" in verifying the information in the note that he believes he received – that the victim's foster mother was unavailable on the initial trial date.

---

[14] (...continued)

> whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor - indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935).

We agree with the hearing judge that Mr. Smith failed to "act with reasonable diligence and promptness" in his obligations to communicate with the victim or her foster mother, and in the need to verify information he presented to the court to obtain a postponement. He therefore violated MLRPC 1.3.

### Conduct Prejudicial to the Administration of Justice – MLRPC 8.4(d)

Under MLRPC 8.4(d), it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice." Not every unnecessary delay or failure to carry out duties expeditiously violates this rule. *See Attorney Grievance Comm'n v. Zeiger*, 428 Md. 546, 559, 53 A.3d 332 (2012) (per curiam) (no MLRPC 8.4(d) violation when attorney's delay in acting as estate administrator caused no substantial harm to anyone). On the other hand, a repeated failure to communicate with clients (or others) that impairs the discharge of the attorney's duties in a case can violate the rule. *See Attorney Grievance Comm'n v. Brown*, 353 Md. 271, 286, 289, 725 A.2d 1069 (1999) (attorney's failure to communicate with client and appear at hearing violated MLRPC 8.4(d)). "The prejudice to the administration of justice may also be measured by the practical implications the attorney's conduct has on the day-to-day operation of our court system." *Attorney Grievance Comm'n v. Dore*, 433 Md. 685, 710, 73 A.3d 161 (2013). An attorney may also violate MLRPC 8.4(d) when the attorney's conduct "reflects negatively on the legal profession and sets a bad example for the public at large." *Attorney Grievance Comm'n v. Brady*, 422 Md. 441, 460, 30 A.3d 902 (2011).

In her conclusions of law, the hearing judge found that Mr. Smith's "singular incident of a lack of due diligence" did not violate MLRPC 8.4(d), in large part because he did not act "with the intentionality required" for such a violation – a criterion that the hearing judge derived from our decision in *Attorney Grievance Comm'n v. Rand*, 429 Md. 674, 716, 57 A.3d 976 (2012).

The Commission devotes the major part of its exceptions to its contention that, contrary to the conclusion of the hearing judge, Mr. Smith's conduct violated MLRPC 8.4(d). The Commission argues that Mr. Smith's conduct was not a singular incident, but a continuous course of neglect that spanned at least nine months, from the time the case was assigned to him in March 2009 through the January 2010 plea deal, and even afterwards when he failed to advise the victim or her foster mother of the disposition of the case. It points out that this persistent behavior deprived the victim and her foster mother of the opportunity to exercise, at any time in the *Head* prosecution, the rights accorded them under Article 47 of the State Constitution and its implementing legislation.

We agree that Mr. Smith's consistent failure to ensure that the appropriate information and notices were provided to the victim and her foster mother, coupled with his failure to verify the information he says that he received concerning the foster mother's unavailability for trial, was prejudicial to the administration of justice. The trial – or, as it turned out, alternative disposition – in the *Head* case was unnecessarily postponed, the victim and victim's representative were denied their right to observe and perhaps participate in the case,

19

and the sentencing court was denied whatever input the victim might have provided in making that important decision.[15] In our view, Mr. Smith's conduct was "prejudicial to the administration of justice."

In concluding that a violation of MLRPC 8.4(d) was not established, the hearing judge accurately quoted our prior decision in *Rand* as stating that a "mere mistake" by an attorney in that case did not "rise to the level of *intentionality* required for an 8.4 violation." *Rand*, 429 Md. at 716 (emphasis added). That statement, however, should be understood in the context of the facts of the *Rand* case. In that case, the issue concerning a possible MLRPC 8.4(d) violation was whether an attorney, who had taken on representation of a group of county correctional officers in a pay dispute, had intentionally misled one officer who had delayed joining the group about that particular officer's individual legal right to obtain financial relief. The attorney treated that officer similarly to the other members of the group in keeping them informed of the progress of the dispute and their collective interests, but failed to provide the late-joining officer with additional information concerning the consequences of the officer's delay on his eligibility for some of the relief. The hearing judge in *Rand* found that the attorney did not have the intent to mislead the late-joining

---

[15] The record in this case does not tell us whether the victim in the *Head* case – or her foster mother – would have had some useful input for the trial judge to consider when she sentenced Mr. Head. But it is the opportunity to provide such input that is important and underlies the statutory obligation to notify victims in certain cases of key proceedings when the victim requests such notice.

officer and this Court deferred to that finding, with the result that the attorney was held not to have violated MLRPC 8.4(d).

In this case, Mr. Smith's inaction was more than a "mere mistake." Rather, it amounted to gross negligence in the discharge of the prosecutorial function. His conduct deprived the child victim and her foster mother of the rights to: (1) know the alleged assailant was being prosecuted, (2) attend the hearings in the case against him, (3) submit a victim impact statement to the court prior to or at his sentencing, and (4) know the terms of the defendant's probation upon release. Even if he did not affirmatively intend to mislead the court or disadvantage the victim, his conduct threatened the fair and efficient administration of justice.

Accordingly, we sustain Bar Counsel's exception and hold that Mr. Smith violated MLRPC 8.4(d).

### False Statements and Misrepresentations – MLRPC 3.3 and 8.4(c)

The alleged violations of MLRPC 3.3 and 8.4(c) both turn on whether Mr. Smith made a *knowing* false statement to the trial court in *State v. Head* at the time he asked for a postponement of the initial trial date. Under MLRPC 3.3, "[a] lawyer shall not knowingly... make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." This requirement is referred to as "candor towards the tribunal." It is based on the idea that "[e]very court has the right to rely upon an attorney to assist it in ascertaining the truth of the case before it.

21

Therefore, candor and fairness should characterize the conduct of an attorney at the beginning, during, and at the close of litigation." *Dore*, 433 Md. at 703 (quoting *In re Discipline of Wilka*, 638 N.W. 2d 245, 249 (S.D. 2001)) (ellipses omitted). In order to establish a violation of MLRPC 3.3, there must be clear and convincing evidence, not only that an attorney provided false information, but also that the attorney knew the information to be false. *Attorney Grievance Comm'n v. Ward*, 394 Md. 1, 32, 904 A.2d 477 (2006).

A violation of MLRPC 3.3 will also often violate MLRPC 8.4(c) as both provisions concern dishonest conduct. *See Dore*, 433 Md. at 707. Under MLRPC 8.4(c), a lawyer is not to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." An attorney who knowingly tells a client or a court a falsehood on a matter material to the hearer can violate MLRPC 8.4(c), even if the attorney has no intent to defraud anyone. *See, e.g.*, *Attorney Grievance Comm'n v. Siskind*, 401 Md. 41, 70, 930 A.2d 328 (2007) ("words spoken by an attorney who knows they were untrue involves an inherent intent to deceive"); *Attorney Grievance Comm'n v. Reinhardt*, 391 Md. 209, 222, 892 A.2d 533 (2006) (telling a client a lie about the progress of her case out of embarrassment violated MLRPC 8.4(c)). While this Court has sometimes drawn fine distinctions among the four horsemen of the rule – dishonesty, fraud, deceit and misrepresentation – each pertains to a false statement by an attorney only if the attorney makes use of the false statement knowing that it is untrue.

It is undisputed that Mr. Smith gave the hearing judge false information when he requested the postponement in September 2009. The foster mother was not in another state,

had no medical emergency, and had not contacted the State's Attorney's Office about her unavailability. Whether Mr. Smith violated MLRPC 3.3 or 8.4(c) thus depends on whether he knew that information was false when he provided it or had an opportunity to correct it. As noted above, the hearing judge found Mr. Smith's testimony before her to be "genuine" and "credible" and accepted his explanation that he had been relying on a note that he received that he thought pertained to the foster mother, although he did nothing to verify it. Accordingly, the hearing judge found that there was not clear and convincing evidence of a necessary element of the charges under MLRPC 3.3 and 8.4(c).

The Commission has excepted to that conclusion. The Commission argues that Mr. Smith must have intentionally misled the trial court because, in its view, he was likely unprepared for trial and needed a reason to postpone the trial past the *Hicks* date. The Commission reasons that, as Mr. Smith had not communicated directly with the victim or foster mother about the case, it was unlikely that the foster mother would try to contact him about missing a trial date. It also argues that he should have contacted the foster mother at some point before the new trial date to prepare her for trial, and discounts his explanation that he did not do so because of the anticipated *Alford* plea. The Commission infers that Mr. Smith was intentionally dishonest.

The determination as to whether Mr. Smith violated MLRPC 3.3 and 8.4(c) turns on an assessment of his credibility when he testified that he did not purposely mislead the Circuit Court at the hearing on September 8, 2009. As this Court has reiterated on numerous

occasions, we defer to the fact findings of the hearing judge "because she is in the best position to assess first hand a witness's credibility." *Attorney Grievance Comm'n v. Sheridan*, 357 Md. 1, 17, 741 A.2d 1143 (1999). This is particularly true when it comes to assessing an attorney's state of mind as to an intent to deceive. "We are constrained to accept that assessment, particularly given the judge's superior ability to evaluate demeanor–based credibility." *Sheridan*, 357 Md. at 29; *see also Attorney Grievance Comm'n v. Tanko*, 427 Md. 15, 49, 45 A.3d 281 (2012) (deferring to trial judge's credibility determinations regarding the attorney's intent to deceive, or lack thereof, for purposes of assessing alleged MLRPC 8.4(c) violation).

It is evident from the detailed findings of fact that the hearing judge carefully considered the testimony and other evidence presented at the hearing, including Mr. Smith's testimony. From the perspective of a reviewing court, we cannot say that the hearing judge's assessment of Mr. Smith's credibility was clearly erroneous. Accordingly, we overrule the Commission's exceptions to the hearing judge's conclusions regarding the alleged MLRPC 3.3 and 8.4(c) violations and decline to find violations of those provisions.

### *MLRPC 8.4(a)*

Under MLRPC 8.4(a), "[i]t is professional misconduct for a lawyer to ... violate or attempt to violate the [MLRPC], knowingly assist or induce another to do so, or do so through the acts of another." As this Court has frequently stated, when an attorney violates

24

a rule of professional conduct, the attorney also violates MLRPC 8.4(a).[16] As we have found

violations of MLRPC 1.3 and 8.4(d), perforce there is also a violation of MLRPC 8.4(a).[17]

## III

## Sanction

The underlying purpose of attorney disciplinary proceedings – and any sanction

imposed – is protection of the public, not punishment of the attorney.   When imposed, a

sanction "should be commensurate with the nature and gravity of the violations and the intent

with which they were committed, taking into account the particular circumstances of each

case and any aggravating or mitigating factors." *Attorney Grievance Comm'n v. Khandpur*,

421 Md. 1, 18, 25 A.3d 165 (2011) (internal quotations omitted).  The Court frequently looks

to a list of possible aggravating and mitigating factors identified by the American Bar

Association's *Standards for Imposing Lawyer Sanctions*, §§9.22, 9.32, reprinted in

Compendium of Professional Responsibility Rules and Standards (2012). *See, e.g., Attorney*

---

[16] *See, e.g., Attorney Grievance Comm'n v. Nelson*, 425 Md. 344, 363, 40 A.3d 1039 (2012).

[17] The hearing judge did not separately discuss MLRPC 8.4(a) in the recommended conclusions of law, but did subsume it in her conclusion that the Commission had not provided clear and convincing evidence of the requisite intent for violations of MLRPC 8.4 generally.  The Commission did not except separately as to the failure to find a violation of MLRPC 8.4(a).  Because there is no special intent requirement for a violation of 8.4(a) and because we conclude that Mr. Smith violated MLRPC 1.3 and MLRPC 8.4(d), we find that there was a violation of MLRPC 8.4(a).  We need not belabor the point because, as a simple reflection of the other violations found, it adds nothing to our consideration of the appropriate sanction.

*Grievance Comm'n v. Shapiro*, ___ Md. ___, ___ A.3d ____ (2015), slip op. at 41; *Attorney Grievance Comm'n v. Coppock*, 432 Md. 629, 648-49 & nn. 17-18, 69 A.3d 1092 (2013).

The hearing judge found no aggravating factors. As to mitigating factors, the hearing judge found that Mr. Smith accepted responsibility for failing to contact the victim and her foster mother, that he was not dishonest, and that he was cooperative during the proceedings. We add that there is no evidence that Mr. Smith has a prior disciplinary record.

The Commission recommends that, if this Court does not find violations of MLRPC 3.3 and 8.4(c), we suspend Mr. Smith indefinitely with the right to apply for reinstatement in 60 days.[18] As noted above, Mr. Smith did not file a recommendation as to the appropriate sanction for what he admits was a serious dereliction of his duties as a prosecutor. When pressed at oral argument, he suggested a public reprimand, in light of the fact that the incident cost him his job.

---

[18] In the event we granted the Commission's exceptions and found violations of MLRPC 3.3 and 8.4(c), the Commission initially recommended disbarment. At oral argument, however, in light of our recent decision in *Attorney Grievance Comm'n v. Litman*, 440 Md. 205, 101 A.3d 1050 (2014), Bar Counsel modified its position to recommend an indefinite suspension with the right to reapply in six months if we found that Mr. Smith had violated MLRPC 3.3 and 8.4(c).

In *Litman*, 440 Md. at 218, this Court rejected the Commission's recommendation for disbarment when an attorney "misrepresented facts to tribunals in an attempt to further his client's goals." We noted that "we have not ... always found disbarment to be the appropriate sanction when there is misrepresentation involved, especially when misappropriation of money is not involved," and indefinitely suspended the attorney with the right to reapply in six months. *Id.* at 218 (quoting *Attorney Grievance Comm'n v. Sperling,* 432 Md. 471, 69 A.3d 478 (2013)) (ellipses added).

26

We accept the Commission's recommendation. We have concluded that Mr. Smith failed to act with the reasonable diligence expected of a member of the bar and that his inaction was prejudicial to the administration of justice in the prosecution of a child sexual abuse case and in the State's compliance with the rights accorded victims under State law. These are serious violations, but the hearing judge found they were not committed with fraudulent or deceitful intent. This Court has often referenced the lack of fraudulent intent when imposing a suspension – in lieu of disbarment – for serious violations. *See, e.g., Khandpur*, 421 Md. at 20; *Attorney Grievance Comm'n v. Nichols*, 405 Md. 207, 218, 950 A.2d 778 (2008). An indefinite suspension is appropriate. The recommended period of suspension is consistent with the sanction imposed in prior cases in which the misconduct consisted at least in part of a lack of reasonable diligence. *See, e.g., Attorney Grievance Comm'n v. Mooney*, 359 Md. 56, 97-98, 753 A.2d 17 (2000) (indefinite suspension with the right to re-apply in 90 days when attorney failed to act with reasonable diligence, as well as committed numerous other violations with respect to four clients). In light of the mitigating factors found by the hearing judge, Mr. Smith may re-apply no sooner than 60 days after the beginning of his suspension.

> **IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO RULE 16-761, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST BRUCE MICHAEL SMITH.**

27

Circuit Court for Baltimore County
Case No. 03-C-13-004267

Argued: November 10, 2014

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 3

September Term, 2013

_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

BRUCE MICHAEL SMITH

_____

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

_____

Concurring and Dissenting Opinion by Watts,
J., which Harrell and Battaglia, JJ., join

_____

Filed:  February 23, 2015

Respectfully, I concur and dissent.[1] This attorney discipline proceeding involves a lawyer who displayed an egregious lack of diligence and candor in his capacity as an Assistant State's Attorney representing the State in a prosecution against a defendant charged with committing crimes against a child. Under this attorney discipline proceeding's unique circumstances, without hesitation, I would hold that the hearing judge's finding that Bruce Michael Smith ("Smith"), Respondent, was credible is not entitled to deference from this Court and that clear and convincing evidence established that Smith violated Maryland Lawyers' Rules of Professional Conduct ("MLRPC") 3.3(a)(1) (Candor Toward the Tribunal) and 8.4(c) (Dishonesty, Fraud, Deceit, or Misrepresentation).

## BACKGROUND

Because the decision not to defer to the hearing judge's credibility finding is based, in large part, on the many facts of the case that amply demonstrate Smith was credible neither in the underlying criminal prosecution before the circuit court nor in the hearing before the hearing judge, I summarize the hearing judge's findings of fact.

On December 16, 1999, this Court admitted Smith to the Bar of Maryland. During the time period relevant to this attorney discipline proceeding, Smith was an Assistant State's Attorney for the Office of the State's Attorney for Harford County, Maryland. Joseph I. Cassilly ("Cassilly") had been the State's Attorney for Harford County since

---

[1] I concur with the Majority's conclusions that Smith violated Maryland Lawyers' Rules of Professional Conduct ("MLRPC") 1.3 (Diligence), 8.4(d) (Conduct that is Prejudicial to the Administration of Justice), and 8.4(a) (Violating the MLRPC).

1983; and, in 2007, Cassilly hired Smith as an Assistant State's Attorney.

In August 2007, Smith was assigned to prosecute cases handled by the Harford County Child Advocacy Center ("the CAC"). The CAC had been established to handle cases involving child sexual assault and abuse, child pornography, and internet solicitation of children. The CAC is staffed by prosecutors, victim/witness advocates, a forensic interviewer, child protective service workers, and sheriff's detectives.

On or about March 31, 2009, Nathan Head ("Head") was indicted for sexual abuse of a minor and fourth-degree sex offense. As part of his duties with the CAC, Smith was assigned to prosecute Head in the Circuit Court for Harford County ("the circuit court"), beginning with grand jury proceedings. As was the practice of the Office of the State's Attorney for Harford County, a file was created and maintained for Head's prosecution.

On April 9, 2009, David Henninger ("Henninger") entered his appearance on behalf of Head. The prosecution file included Henninger's entry of appearance, the State's and Head's discovery requests, and the State's responses to Head's discovery requests. Smith signed the State's responses, which included a list of potential witnesses, identifying the following people as potential witnesses: (1) the child victim ("the victim") by the victim's initials; (2) the victim's adult guardian; (3) Detective Thomas Bradley; and (4) Leanda Daniels, a social worker with the CAC. In the State's discovery responses, contact information was provided for all of the witnesses except for the victim.

On or about April 30, 2009, Smith received notice that Head's trial was scheduled for September 8, 2009. On September 8, 2009, Smith appeared on behalf of the State in the circuit court and requested a postponement, advising the circuit court that the victim's

guardian, a necessary witness, was unavailable. Specifically, Smith stated: "I have a witness who is necessary for the case who is not available at this time." When asked by the circuit court to elaborate, Smith stated: "[I]t's my understanding [] that . . . [the victim's guardian], is absent at this time, out of town, and apparently it's some kind of medical emergency, I believe in Connecticut, Your Honor. I don't have my note with me. She is a necessary, critical witness in this case, therefore, the State is seeking postponement. There has been no other dates before this, Your Honor." The circuit court granted the postponement, stating: "For the matter stated by the State, that a critical witness is unavailable here today, this matter will be postponed for that reason. I find the reason constitute[s] good cause."

Trial was rescheduled for January 4, 2010. On that date, Head pled guilty to fourth-degree sex offense. The circuit court sentenced Head to one year of imprisonment, with all but 142 days suspended and credit for time served, followed by three years' probation. Importantly, as a condition of probation, Head was to have no contact, by any means, with the victim. At sentencing, Smith did not offer the circuit court a victim impact statement or any other information from the victim or the victim's family.

In 2012, the Division of Correction contacted the Office of the State's Attorney for Harford County concerning Head's release. The Division of Correction was unable to locate contact information to notify the victim of Head's release, so the Office of the State's Attorney agreed to contact the victim's guardian. As a result, the Office of the State's Attorney discovered, among other things, that the victim's guardian was unaware that Head had pled guilty and been sentenced; she had been unaware of the September 8, 2009 trial

date, and had never advised that she was out-of-state; and, for that matter, she was unaware that Head had ever been charged. Upon this discovery, the prosecution file was reviewed; the prosecution file contained a notation that the September 8, 2009, postponement was due to the victim's unavailability. Thereafter, transcripts of the September 8, 2009, hearing and the January 4, 2010, guilty plea hearing were ordered.

On or about March 21, 2012, Cassilly confronted Smith about the request for postponement and the information obtained from the victim's guardian (*i.e.*, that she was not aware that Head had been charged, that she had never contacted anyone with regard to traveling out-of-state for a medical emergency, and that she had not, in actuality, traveled out-of-state for a medical emergency). Cassilly told Smith he had concerns about his lack of candor in requesting the postponement and requested Smith's resignation. Cassilly could not recall Smith offering an explanation other than that a note should have been in the prosecution file. Cassilly looked for, but did not find, a note in the prosecution file relating to the unavailability of the victim's guardian or the information that Smith provided to the circuit court on September 8, 2009. After his meeting with Cassilly, Smith's employment as an Assistant State's Attorney was terminated.

In addition to the issues related to the September 8, 2009 postponement request, Cassilly discovered nothing in the prosecution file indicating that the victim had been summonsed for either circuit court date; and neither the prosecution file nor the circuit court's file contained a copy of the Victim Notification Request form that Maryland law

requires.[2]  In addition, neither the prosecution file nor the circuit court's file contained a form certifying that the victim had been notified of her rights; filing such a certification form was Smith's responsibility.  According to Cassilly, it was Smith's responsibility to meet with the victim prior to trial, introduce himself, establish a relationship with the victim, and know how the victim would handle questions or respond on the stand; but, the prosecution file contained no notes concerning a pretrial interview with the victim by Smith.  The prosecution file contained a statement given by the victim to a social worker at the CAC on February 20, 2009, which was audio and video taped;[3] and, according to Cassilly, it was customary to use such a recording at trial.  Although it was Smith's responsibility to file a motion in the circuit court concerning the State's intention to use the recording at trial, Smith failed to do so.

It was also Smith's responsibility to see that subpoenas/summonses were issued to witnesses to appear for trial.  The usual practice of the Office of the State's Attorney for Harford County was as follows.  Although witnesses were occasionally notified about other

---

[2]Md. Code Ann., Crim. Proc. (2008 Repl. Vol.) § 11-104(c)(1) provides:

> Within 10 days after the filing or the unsealing of an indictment or information in circuit court, whichever is later, the prosecuting attorney shall:
>
> (i) mail or deliver to the victim or victim's representative the pamphlet described in § 11-914(9)(ii) of this title and the notification request form described in § 11-914(10) of this title; and
> (ii) certify to the clerk of the court that the prosecuting attorney has complied with this paragraph or is unable to identify the victim or victim's representative.

[3]A document signed by the victim's guardian consenting to the audio and videotaping of the victim's statement was in the prosecution file.

- 5 -

types of hearings by telephone or by letter, the assigned Assistant State's Attorney typically sent a summons and followed up by letter. The summonses/subpoenas are computer-generated. The clerical staff at the Office of the State's Attorney for Harford County enter a date into the computer system; the computer searches for all cases that are scheduled for that date; and a batch of the subpoenas/summonses for that date is printed. Thereafter, the clerical staff separate the summonses, attach them to the front of the prosecution file, and give them to the assigned Assistant State's Attorney for signature. The process allows the assigned trial attorney to review the summonses/subpoenas already issued and to make sure that all of the witnesses needed for the trial date were issued a summons/subpoena. If Smith received the prosecution file in Head's case and realized there were no summons/subpoena for a necessary witness, Smith could have had a summons/subpoena issued for that witness prior to trial.

Pursuant to the procedure described above, the prosecution file and the circuit court's file contained copies of subpoenas signed by Smith for the September 8, 2009, trial date. The subpoenas, issued on August 3, 2009, were addressed to Head and Detective Thomas Bradley of the Harford County Sheriff's Department. There were no copies of subpoenas for the victim or her guardian for either trial date. It was Smith's responsibility, as the assigned Assistant State's Attorney, to keep the victim and her guardian informed of the proceedings, but the prosecution file contained no notes or other records of any communications with the victim or members of her family between the September 8, 2009, trial date and the January 4, 2010, trial date.

After the circuit court proceeding on January 4, 2010, at which Head pled guilty,

Smith did not communicate with the victim or her guardian. And, although one of the conditions of Head's probation was that he have no contact, by any means, with the victim, there was no record that Smith or anyone else contacted the victim or her guardian concerning the case's disposition and the condition of probation imposed. At the hearing, Cassilly testified that, generally, the assigned Assistant State's Attorney communicates with the victim concerning the case's disposition. Barring that, the Office of the State's Attorney for Harford County has a system under which, if the victim is not present, a letter detailing the case's disposition is sent to the victim and/or the CAC victim's advocate contacts the victim. At the disciplinary hearing, Smith admitted that he was responsible for notifying the victim and/or the victim's guardian concerning the conditions of Head's probation, but that he failed to do so.

The victim's guardian testified that, after the victim gave a recorded statement on February 20, 2009, she heard nothing from the CAC or the Office of the State's Attorney about the allegations against Head. The victim's guardian did not attempt to contact anyone about the allegations against Head because she got caught up in other matters, and assumed that the victim had not been believed and that the matter had been dropped. According to the victim's guardian, in 2012, she was contacted by someone about Head, and, as a result, discovered that Head had been prosecuted. The victim's guardian testified that, had she been contacted in 2009, she would have cooperated in the prosecution. The victim's guardian also testified that she would have liked to have known that Head had been prosecuted. The victim's guardian testified that she did not leave a telephone message for anyone in the Office of the State's Attorney for Harford County advising that she was

- 7 -

unable to attend a hearing or that she was out-of-state for a medical emergency.

The hearing judge expressly found Cassilly and the victim's guardian credible.

At the hearing, Smith testified that he had no independent recollection of the case, and had refreshed his recollection by reviewing the transcript and other documents. Smith admitted responsibility for a lack of due diligence in handling the case. Smith testified, however, that he would not have fabricated an excuse for a postponement and he believed that his communication to the circuit court regarding the victim's guardian's absence was not untrue. Smith did not dispute the validity of the underlying fact—*i.e.*, the victim's guardian had not traveled out-of-state—but testified that he believed that what he stated on the record was not fabricated. During cross-examination, Smith testified that, at the relevant time, he had a heavy case load and had requested that his District Court case load be reduced so he could devote more time to his assigned CAC case load. The hearing judge found that Smith "appeared credible, genuine, and truthful" when testifying at the hearing.

On November 10, 2014, we heard oral argument. In opening argument, Smith urged this Court to adopt the hearing judge's findings of fact and conclusions of law, and submitted. In response to questions posed by Chief Judge Mary Ellen Barbera, Smith recommended that we reprimand him. In rebuttal argument, Smith again asked this Court to adopt the hearing judge's findings of fact and conclusions of law. In response to questions from the Court, Smith stated that he made the postponement request in the circuit court based on the information that he had at the time, and that, in any event, the Head case was not going to proceed to trial on September 8, 2009. When asked when he knew the case would not proceed to trial, Smith stated that his "guess" was "probably" weeks prior

- 8 -

to the September 8, 2009, trial date, although Smith acknowledged that he had not seen the file between 2009 and 2012, and that he had not testified before the hearing judge concerning the case not proceeding to trial.

Smith also stated that he did not know whether he had testified about when he learned that Head was going to plead guilty, but believed he had not testified about it because he did not know the date. Smith again admitted that he did not have any independent recollection of the case. When asked how this Court could reconcile the hearing judge's findings that both Smith and the victim's guardian were credible, Smith responded that he "testified to the truth" and that, "when asked how that note came about," he "explained that, obviously, someone had left it on [his] desk and that's what [he] presented to the [circuit] court." Smith maintained that "the note was the only information [that he] had," and that he "accepted responsibility for not following up" to verify the information contained in the note before presenting it to the circuit court.

And, in contrast to his testimony, in which he acknowledged that contacting the victim after the guilty plea was his responsibility, Smith advised us that it was the responsibility of a victim-witness coordinator to contact the victim's guardian and advise her of the guilty plea and the condition that Head have no contact with the victim. Smith stated that he "accepted responsibility for" not following up to make sure that the victim-witness coordinator contacted the victim. In response to a question as to whether the record contained any information about the victim-witness unit and how it functions, Smith stated: "No, I don't believe so." Smith conceded that he had no basis in this Court's jurisprudence for recommending a reprimand as the appropriate sanction.

- 9 -

**DISCUSSION**

Maryland Rule 16-759(b)(2)(B) provides, in relevant part: "If exceptions are filed, the Court of Appeals shall determine whether the findings of fact have been proven by the requisite standard of proof set out in Rule 16-757(b).[4] . . . The Court shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses." We accept a hearing judge's proposed findings of fact, unless clearly erroneous, and have explained that "[t]his deferential standard of review is in place because the hearing judge is in the best position to assess the credibility of witnesses and parties." Attorney Grievance Comm'n v. Walker-Turner, 428 Md. 214, 226, 51 A.3d 553, 560 (2012) (citations omitted); see also Attorney Grievance Comm'n v. London, 427 Md. 328, 343, 47 A.3d 986, 995 (2012) ("We accept a hearing judge's findings of fact unless we determine that they are clearly erroneous. That deference is appropriate because the hearing judge is in a position to assess the demeanor-based credibility of the witnesses." (Citation omitted)).

We have stated that "[w]eighing the credibility of witnesses and resolving any conflict in the evidence are tasks proper for the fact finder." Attorney Grievance Comm'n v. Marcalus, 414 Md. 501, 512, 996 A.2d 350, 356 (2010) (citation and internal quotation marks omitted) (alteration in original). Accordingly, "in an attorney discipline proceeding, the hearing judge may elect to pick and choose which evidence to rely upon because he or she is in the best position to assess first hand a witness's credibility[.]" Attorney Grievance

---

[4]Maryland Rule 16-757(b) provides, in pertinent part, that the Attorney Grievance Commission "has the burden of proving the averments of the petition [for disciplinary or remedial action] by clear and convincing evidence."

Comm'n v. Payer, 425 Md. 78, 93, 38 A.3d 378, 387 (2012) (citations and internal quotation marks omitted). We have also explained "that 'clear and convincing evidence' means only that the witnesses to a fact must be found to be credible, and that the facts to which they have testified are distinctly remembered and the details thereof narrated exactly and in due order, so as to enable the trier of the facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." Id. at 93, 38 A.3d at 387 (citation and internal quotation marks omitted).

A careful review of our existing jurisprudence leads to the conclusion that we are not required to accept a hearing judge's credibility finding in lockstep where there is good reason to doubt the finding and the record contains facts that contradict the finding. Although it is accurate that weighing witness credibility is the job of the hearing judge and that we generally defer to such findings, our jurisprudence has always allowed for the possibility that there would be a case in which the hearing judge's credibility finding would be clearly erroneous.

In Attorney Grievance Comm'n v. Sheinbein, 372 Md. 224, 248, 812 A.2d 981, 995 (2002), this Court determined that a lawyer "had the specific intent to obstruct or hinder [an] investigation and probable arrest of his son by sending [his son] to Israel." In so concluding, we first evaluated the hearing judge's finding concerning the lawyer's credibility to "determine whether those findings [we]re clearly erroneous." Id. at 245, 812 A.2d at 993. We observed that the hearing judge had found that the lawyer was not credible when he testified before a Grand Jury that his intent in sending his son to Israel was to save his son from another individual, suicide, or a police shootout. Id. at 245, 812 A.2d at 993.

- 11 -

Upon independent review, we stated that "[t]he record [wa]s replete with facts" supporting the hearing judge's credibility finding. Id. at 245, 812 A.2d at 993.

And, in London, 427 Md. at 350-51, 47 A.3d at 999-1000, we concluded that a lawyer violated MLRPC 8.4(c) by making misrepresentations or failing to communicate a material fact about the status of work that he had completed for a client. Before the hearing judge, the client testified that the lawyer had told him that a deed had been filed. Id. at 350, 47 A.3d at 999. By contrast, the lawyer testified that the agreement with the client was that the lawyer would prepare the deed, but that the client would file the deed. Id. at 350, 47 A.3d at 999. Ultimately, no deed was filed. Id. at 349, 47 A.3d at 999. The hearing judge found the client credible, and found the lawyer "not as credible[.]" Id. at 335, 47 A.3d at 990. In concluding that the lawyer violated MLRPC 8.4(c), we stated: "With no reason to doubt the hearing judge's finding that [the client] was a more credible witness than [the lawyer], we conclude that the evidence is plainly sufficient to support a violation of [MLRPC] 8.4(c)." Id. at 351, 47 A.3d at 1000 (footnote omitted).

Here, there are myriad good reasons to doubt the hearing judge's credibility finding as to Smith, and the record is overflowing with facts that contradict the hearing judge's finding. Indeed, the hearing judge's own findings of fact compel the conclusion that Smith was not credible, and that he misled the circuit court in representing that a critical witness was unavailable for trial due to traveling out-of-state for a medical emergency.

There were a number of unusual circumstances accompanying Smith's request for a postponement in the circuit court on September 8, 2009. The hearing judge found that, during the circuit court proceeding, Smith stated that a witness, the victim's guardian, was

- 12 -

unavailable, "absent . . ., out of town, and apparently it's some kind of medical emergency, . . . in Connecticut," but that he did not "have [his] note with [him]." Smith did not produce the alleged note in the circuit court, and Smith did not advise the circuit court of how he came into possession of a note regarding the victim's guardian's unavailability when he had neither contacted the victim's guardian to advise her of the trial date nor summonsed her to appear as a witness. Nor was the note placed in the prosecution file.

Several years later, when Cassilly received conflicting information concerning the postponement request—*i.e.*, the information that Cassilly had obtained from the victim's guardian (that she was not aware that Head had been charged, that she had never contacted anyone with regard to traveling out-of-state for a medical emergency, and that she had not, in actuality, traveled out-of-state for a medical emergency)—and met with Smith, Smith offered no explanation or details other than that a note should have been in the prosecution file. Cassilly looked for, but, contrary to Smith's assurance, did not find, a note in the prosecution file relating to the victim's guardian's unavailability or a note regarding any information provided by Smith to the circuit court on September 8, 2009. After Smith's meeting with Cassilly, Cassilly terminated Smith's employment with the Office of the State's Attorney for Harford County. The logical conclusion is that Cassilly did not believe Smith's account of the September 8, 2009, postponement request before the circuit court.

Compounding the irregularities attendant to the September 8, 2009, postponement request, at the hearing, Smith testified that he had no independent recollection of the case, but that "he would not have fabricated such an excuse" to the circuit court and that he believed what he told the circuit court regarding the victim's guardian's absence "was not

untrue." In short, before the hearing judge, Smith simply testified that he would not have been untruthful about receiving the note. It is undisputed, however, based on the hearing judge's findings of fact, that Smith never contacted the victim's guardian to inform her of the prosecution or of either the September 8, 2009, or January 4, 2010, trial dates. Specifically, the victim's guardian testified that nobody from the Office of the State's Attorney for Harford County had ever been in touch with her, not even to inform her that Head was being prosecuted. At the hearing, Smith acknowledged that it was his responsibility to notify the victim and her guardian about the prosecution and trial dates, but that he failed to do so. Yet, oddly, Smith failed to provide any explanation whatsoever as to why he would have unexpectedly received a note about the unavailability of a critical witness—the victim's guardian—whom, as he knew, he had not contacted to inform of the prosecution or of the particular trial date.

Although Smith has offered the explanation that he would not have fabricated an excuse for a postponement and that he believes his communication with the circuit court regarding the victim's guardian's absence was not untrue, simply put, the evidence admitted at the disciplinary hearing does not support Smith's allegation. Based on the evidence, there are only two logical explanations for Smith's position—either the victim's guardian was not truthful concerning her lack of contact with the Office of the State's Attorney for Harford County, or, in September 2009, Smith came into possession of a note unrelated to Head's case that he mistook as pertaining to the victim's guardian. As to the first possibility, the hearing judge expressly found the victim's guardian credible, and nothing in the record casts a reasonable doubt on that finding; *i.e.*, the record presents no

circumstances contradicting the victim's guardian's account that she was not contacted by the Office of the State's Attorney for Harford County and did not know of Head's prosecution. And Smith agrees that he did not contact the victim's guardian. As to the second possibility, no evidence has been produced demonstrating that Smith received in error a note concerning the victim's guardian's absence or that Smith received a note pertaining to another matter or, for that matter, that a note pertaining to the victim's guardian was misplaced in another prosecution file. In short, there is no scenario grounded in the evidence admitted at the hearing under which Smith's version could be accurate.

Although this Court gives due regard to a hearing judge's credibility finding, in the instant case, in the face of all of the countervailing evidence admitted at the hearing and in light of the hearing judge's own findings of fact, this Court is not required to mindlessly accept the hearing judge's unexplained finding that Smith was credible.[5] Under this attorney discipline proceeding's unique circumstances, given the many good reasons to doubt Smith's credibility and that the evidence, in actuality, contradicts a finding that Smith was credible, I would not defer to the hearing judge's illogical finding concerning Smith's credibility. Clear and convincing evidence requires not only that a witness be found to be credible, but also "that the facts to which [the witness has] testified are distinctly

---

[5]As an aside, although the hearing judge found that Smith "appeared credible, genuine and truthful in testifying before" the hearing judge, the hearing judge did not explain, elaborate, or even mention a fact supporting the finding (*i.e.*, the hearing judge did not state that the credibility determination was based on Smith's demeanor or something else, nor did the hearing judge state that the credibility finding was confirmed by evidence admitted at the hearing). To be sure, hearing judges are permitted to make demeanor-based credibility findings. Here, however, overwhelming evidence contradicts the validity of such a finding concerning Smith's credibility.

remembered and the details thereof narrated exactly and in due order, so as to enable the [hearing judge] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." Payer, 425 Md. at 93, 38 A.3d at 387 (citation and internal quotation marks omitted). Again, Smith neither testified as to any remembered facts nor provided any detail concerning the particulars of his prosecution of Head; to the contrary, Smith testified that he had no independent recollection of the matter.[6] In other words, nothing in Smith's testimony could have led the hearing judge to come to find by clear and convincing evidence that Smith would not have misled the circuit court about the note.[7]

I would reverse the hearing judge's conclusion that Smith did not violate MLRPC 3.3(a)(1) and 8.4(c). MLRPC 3.3(a)(1) provides that "[a] lawyer shall not knowingly: [] make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer[.]" (Paragraph break omitted). MLRPC 8.4(c) provides: "It is professional misconduct for a lawyer to . . .

---

[6]At oral argument, the Honorable Glenn T. Harrell, Jr. asked Smith whether he remembered the character Sergeant Schultz from the television show "Hogan's Heroes." Smith responded: "Yes." Judge Harrell pointed out that Sergeant Schultz's catchphrase was "I know nothing," which "seems to have been [Smith's] defense before the [hearing] judge." Given Smith's testimony that he has no independent recollection of the case, Judge Harrell's comparison is well-taken.

[7]And, disconcertingly, despite admitting at the hearing that it was his responsibility to notify the victim and/or her guardian of Head's guilty plea and conditions of probation, at oral argument, Smith advised that it would have been the responsibility of a victim-witness coordinator to contact the victim and/or her guardian concerning Head's guilty plea. In other words, although, at the hearing Smith acknowledged his responsibility to contact the victim after the guilty plea, Smith changed his tune between the disciplinary hearing and oral argument, and decided that responsibility for contacting the victim after the guilty plea rested with a victim-witness coordinator. The conflicting information provided by Smith as to who was responsible for contacting the victim and/or her guardian following Head's guilty plea undermines the finding that Smith was credible.

engage in conduct involving dishonesty, fraud, deceit[,] or misrepresentation[.]" Given the hearing judge's findings of fact, I would conclude that Smith violated MLRPC 3.3(a)(1) and 8.4(c) by lying to the circuit court when making the postponement request. The hearing judge's findings of fact are more than sufficient to demonstrate that Smith—who admitted that he had a heavy case load and had requested that his case load be reduced, and who failed to even inform the victim or her guardian of Head's prosecution or of the initial trial date—fabricated an excuse for a postponement to cover up his complete lack of diligence in the handling of Head's prosecution. In my view, there is no other reasonable or logical conclusion that can be reached given the hearing judge's findings of fact, notwithstanding the hearing judge's inexplicable credibility finding.

In accordance with the Commission's recommendation at oral argument, I would indefinitely suspend Smith from the practice of law in Maryland with the right to apply for reinstatement no sooner than six months after the effective date of the suspension. Cf. Attorney Grievance Comm'n v. Litman, 440 Md. 205, 206, 217, 222, 101 A.3d 1050, 1052, 1057, 1058, 1061 (2014) (In a reciprocal discipline case, where, among other things, the lawyer "misrepresented intentionally facts and the law to both judicial and administrative tribunals" and "either made deliberately the misrepresentations at issue or blinded himself

willfully to the falsity of his contentions[,]" this Court concluded that the appropriate sanction was an indefinite suspension with the right to apply for reinstatement no sooner than six months after the effective date of the suspension.).  For the above reasons, respectfully, I concur and dissent.

Judge Harrell and Judge Battaglia have authorized me to state that they join in this opinion.